Beverly Lois TAYLOR and Jeffrey D. Taylor, individually and as next friends for James Taylor, Joshua Taylor, Jacob Taylor, and Hannah Taylor, minors, and Jeffrey D. Taylor, Jr., Appellants,

v.

John W. CARLEY, Appellee.

No. 14–03–00661–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 28, 2004.

Rehearing En Banc Overruled March 10, 2005.

Taylor, Joshua Taylor, Jacob Taylor, and Hannah Taylor, minors, and Jeffrey D. Taylor, Jr., sued appellee/defendant John W. Carley, Ph.D., a psychologist, alleging that Dr. Carley negligently misdiagnosed Beverly Taylor's condition and failed to follow her symptoms after referring her to a psychiatrist. Dr. Carley moved for summary judgment on traditional and no-evidence grounds, and the trial court granted the motion. We conclude (1) there is no evidence that Dr. Carley's alleged negligence in diagnosing Mrs. Taylor proximately caused her injury, and (2) Dr. Carley had no duty to follow or monitor Mrs. Taylor's condition after she stopped seeing him. Accordingly, we affirm.

## I. Factual and Procedural Background

Mrs. Taylor's first appointment with Dr. Carley occurred in September 1998. Mrs. Taylor consulted with him because she had just returned to full-time work outside the home, was experiencing feelings of anxiety, and having problems in her marriage. In the course of her treatment with Dr. Carley, Mrs. Taylor discussed her oldest son's attention deficit/hyperactivity disorder ("ADHD"). Dr. Carley eventually had Mrs. Taylor take some computerized tests, which, according to Mrs. Taylor, Dr. Carley said were to test for possible ADHD. Toward the end of his sessions with Mrs. Taylor, Dr. Carley diagnosed her as having attention deficit disorder ("ADD"), not hyperactivity, as well as other conditions.[1] Dr. Carley told Mrs. Taylor he wanted a psychiatrist or other medical doctor to evaluate her and determine what her medication needs might be.

Dr. Carley told Mrs. Taylor about Dr. John Steffek, a psychiatrist who rented office space from Dr. Carley and saw pa-

Alton C. Todd, Friendswood, Sheila Lee Haddock, Houston, for appellants.

Norman Snyder, Jr., Wendi Ervin Powers, William J. Sharp, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices FROST and GUZMAN.

## OPINION

KEM THOMPSON FROST, Justice.

This case presents a dispute between a psychologist and his former patient. We must determine (1) whether the psychologist's alleged negligent diagnosis caused the patient's injury, and (2) whether the psychologist, who had referred the patient to a psychiatrist and who was no longer seeing the patient, had a duty to monitor her progress. Appellants/plaintiffs Beverly Lois Taylor and Jeffrey D. Taylor, individually and as next friends for James

---

1. Dr. Carley appears to have used ADD and ADHD interchangeably in his notes, explaining "ADHD is kind of like the vernacular you use which could include ADD or ADHD."

tients at that location one day a week. Dr. Carley advised Mrs. Taylor that Dr. Steffek generally treated adolescents and children. Mrs. Taylor knew she was free to see any psychiatrist or other medical doctor she chose, but made her independent choice to consult with Dr. Steffek.

Dr. Steffek met with Mrs. Taylor in mid-December 1998. At that time, they talked about multiple issues to clarify or rule out a diagnosis of ADHD. Before meeting Mrs. Taylor, Dr. Steffek had access to Mrs. Taylor's history from Dr. Carley, but Dr. Steffek had not arrived at the conclusion that Mrs. Taylor had ADHD. Based on his interaction with Mrs. Taylor and having her talk about questions on a printed page he gave her, Dr. Steffek concluded Mrs. Taylor exhibited seven of nine phenomena for a diagnosis of ADHD, inattentive type.[2] This was one of Dr. Steffek's three final diagnoses, the other two being generalized anxiety disorder and mixed personality with compulsive, dependent features.

Dr. Steffek told Mrs. Taylor she needed to undergo blood tests, a urinalysis, and an electrocardiogram before he could prescribe medication. Mrs. Taylor completed the blood tests and the urinalysis, but did not have the electrocardiogram. According to Mrs. Taylor, she chose not to have the electrocardiogram because she was busy working and had five children. Dr. Steffek subsequently told Mrs. Taylor she did not need the electrocardiogram because the results of the laboratory work were favorable. Dr. Steffek then gave Mrs. Taylor Dexedrine tablets and told her to try them and also to redo the computer test with Dr. Carley after taking the Dexedrine. Mrs. Taylor reported that her husband was seeing a difference in her behavior, and the results of the re-test also showed improvement after the Dexedrine.

In mid-January 1999, Dr. Steffek first prescribed Adderall for Mrs. Taylor.[3] Dr. Steffek would write the prescriptions one way, but give Mrs. Taylor different directions for taking the medication.[4] Dr. Steffek also instructed Mrs. Taylor to gradually increase the dose, determine how she would feel, and determine whether she had any of the side-effects that typically appear with this medication. If there were no side-effects and functioning was not optimal, Mrs. Taylor was to increase the first dose of the day to attempt to get a more beneficial response. Mrs. Taylor saw Dr. Steffek again in mid-February 1999, and saw him every two months thereafter. According to Mrs. Taylor, sometime around April 1999, she started experiencing headaches and weight loss and reported these symptoms to Dr. Stef-

2. Mrs. Taylor testified that Dr. Steffek did not run any independent tests on her. This testimony is consistent with the interactive nature of Dr. Steffek's approach to diagnosis, which involves the patient talking about each of the phenomena on the printed form rather than having them fill out a checklist.

3. Adderall is an amphetamine. At the time of Dr. Steffek's deposition in February 2002, the Federal Drug Administration had not approved Adderall for adult use. Dr. Steffek prescribed Adderall instead of Dexedrine for the patient's "ultimate convenience," because it has a "longer therapeutic day."

4. For example, the January 12, 1999 prescription was for 135 ten-milligrams tablets. The instructions provided with the prescription were to take one-and-a-half tablets three times a day, but Dr. Steffek instructed Mrs. Taylor to begin by taking ten milligrams in the morning and ten milligrams in the afternoon and build the dose up to twenty milligrams in the morning and ten in the afternoon. Dr. Steffek wrote the prescriptions the way he did "for the convenience of the patient and through the exigencies of dealing with the insurance companies who then determine how many pills a person can use during a month."

fek. There is some evidence that, at one point, Mrs. Taylor was taking twenty milligrams of Adderall in the morning and twenty in the afternoon, but that was subsequently reduced to fifteen milligrams in the morning and ten in the afternoon.[5] Dr. Steffek never checked Mrs. Taylor's blood pressure while she was under his care.

According to Mrs. Taylor, she saw Dr. Carley two times after she started taking the Adderall, the second occasion being February 23, 1999. Mrs. Taylor did not report any problems with the medications or side effects to Dr. Carley. At the February 23 visit, Mrs. Taylor reported to Dr. Carley that she was "doing well." Mrs. Taylor then started missing appointments with Dr. Carley. Dr. Carley wanted Mrs. Taylor to reschedule the missed appointments, but Mrs. Taylor explained to him she could not do so because she could not be missing two or three days a week going to appointments for two different doctors. By the time Mrs. Taylor started experiencing headaches and weight loss, she had stopped seeing Dr. Carley.

Mrs. Taylor testified that by September 1999, she was taking fifteen milligrams of Adderall in the morning and ten milligrams in the afternoon. On September 24, 1999, Mrs. Taylor was hospitalized with "sudden onset of confusional state, headache, and agitation." Two computered tomography scans performed that day were normal. According to her medical record, Mrs. Taylor's "presentation, especially the presence of hypertension and mild tachycardia, was suspected of amphetamine toxicity."[6] Magnetic resonance imaging ("MRI") was performed the following days. Repeat MRIs showed ischemia (restricted blood flow) of the upper medullary region. Mrs. Taylor had suffered a stroke.

Mrs. Taylor and her husband sued Dr. Carley, Dr. Steffek, three Walgreen entities, and the manufacturer and supplier of Adderral.[7] The Taylors alleged Dr. Carley was negligent in (1) failing to assess and evaluate Mrs. Taylor's status and response to medical treatment and to report such findings to the physician; (2) failing to assess and diagnose Mrs. Taylor's condition accurately; (3) failing to assess the true extent of the symptoms from which Mrs. Taylor was suffering; (4) failing, on Mrs. Taylor's subsequent visits, to perform an assessment of the side-effects of the prescribed Adderall; (5) ignoring Mrs. Taylor's reports of symptoms associated with side-effects from the prescribed Adderall; and (6) deviating from the standard of care for a psychologist treating a patient with complaints like Mrs. Taylor's.

Dr. Carley moved for summary judgment on traditional and no-evidence grounds. He alleged he was entitled to summary judgment as a matter of law because he owed no duty to Mrs. Taylor to:

(1) assess and evaluate Mrs. Taylor's status and response to medical treatment and to report such findings to the physician;

(2) accurately assess and diagnose Mrs. Taylor's condition "for purposes of

5. Mrs. Taylor testified she never took forty milligrams, but stated she was not sure whether she took twenty milligrams at 6:00 a.m. and twenty at 1:00 p.m.

6. According to the discharge summary for Mrs. Taylor, she "had a history of adult onset ADD and has been treated with 40 mg of dextroamphetamine daily for nearly two years."

7. Mrs. Taylor's husband and her adult son also filed loss of consortium claims, and Mrs. Taylor and her husband filed loss of consortium claims on behalf of their four minor children.

evaluating her need for medication, contraindications to any medication, such as Adderall, side effects of [sic] symptoms associated with that medication";

(3) assess the true extent of the symptoms Mrs. Taylor was suffering "as it relates to symptoms [Mrs. Taylor] claims to have sustained as a result of taking Adderall"; and

(4) to perform an assessment of the side-effects of the prescribed Adderall on Mrs. Taylor's subsequent visits.

In the trial court, Dr. Carley argued the uncontroverted evidence established he was a psychologist, not a psychiatrist, and as such, he had a duty to evaluate Mrs. Taylor's psychological symptoms "for the purposes of providing counseling, but not for the purposes of determining whether medication is required or whether [Mrs. Taylor] is having adverse symptoms, resulting from use of Adderall." He argued there was no breach of duty because the evidence established Mrs. Taylor never complained to Dr. Carley of "any symptoms, side effects, or adverse consequences, whatsoever, whether related to the Adderall or not." Finally, Dr. Carley argued there was no causation because, although Mrs. Taylor might raise issues about the adequacy of his note-taking, the accuracy of his diagnosis, or the adequacy of his counseling, none of these acts or omissions could have proximately caused Mrs. Taylor's stroke, which she claimed resulted solely from taking the Adderall. Dr. Carley also pointed to Dr. Steffek's testimony that Dr. Steffek had prescribed the Adderall and had not relied on Dr. Carley's notes, treatment, or diagnosis in deciding to prescribe the medication to Mrs. Taylor. In support of the traditional motion for summary judgment, Dr. Carley attached his own deposition testimony and that of Mrs. Taylor and Dr. Steffek.

Dr. Carley also moved for no-evidence summary judgment under Texas Rule of Civil Procedure 166a(i), alleging there was no evidence as to duty, breach of duty, or proximate cause. He specifically asserted:

Particularly, there is no evidence that Dr. Carley prescribed Adderall to Beverly Taylor; there is no evidence that Dr. Steffeck [sic] based his decision to prescribe Adderall to Beverly Taylor in whole or in part on Dr. Carley's findings or diagnosis of ADHD; there is no evidence that Dr. Carley knew or should have known of the potential adverse consequences of the drug Adderall upon Mrs. Taylor; there is no evidence that Dr. Carley knew or should have known of adverse symptoms or effects suffered by Mrs. Taylor following prescription of the Adderall; there is no evidence that Dr. Carley's acts or omissions, if any, proximately caused the damages she complains of, all of which arose or are derived from her claim that she sustained a stroke as a result of taking Adderall.

The Taylors responded to the summary judgment motions and also objected to Dr. Carley's reliance on the depositions of Dr. Steffek and Dr. Carley because both individuals were interested parties. The Taylors' own summary-judgment evidence consisted of (1) excerpts from the depositions of Dr. Carley, Dr. Steffek, and Mrs. Taylor, (2) an affidavit from Ron Kimball, Ph.D., who had reviewed Dr. Carley's chart notes for Mrs. Taylor, (3) a letter from Mitchell S. Felder, M.D., Mrs. Taylor's psychiatrist expert, and (4) Northeast Medical Center Hospital's discharge summary for Mrs. Taylor. The Taylors attempted to adduce evidence regarding duty solely by pointing to the uncontro-

verted evidence that Mrs. Taylor was Dr. Carley's patient.

The Taylors attempted to raise a genuine fact issue regarding the breach-of-duty element by referring to Dr. Kimball's affidavit. Dr. Kimball criticized the incompleteness of Dr. Carley's notes, and opined that Dr. Carley had violated the standards of care by (1) using an inappropriate technique (biofeedback) to assess ADHD in an adult; (2) using a standard psychological battery not considered reliable in evaluating possible Axis I disorders (anxiety disorder); and (3) never completing a formal process of diagnosis. Regarding breach of duty, Mrs. Taylor also relied on Dr. Carley's deposition testimony that (1) he had made the diagnosis of ADD; (2) ADD had to have been present before age seven; (3) Mrs. Taylor had not previously been diagnosed with ADD; and (4) Mrs. Taylor did not have hyperactivity (required for ADHD).

Finally, the Taylors attempted to raise a genuine fact issue regarding the causation element by referring to the following events: (1) Adderall was prescribed for Mrs. Taylor's misdiagnosed ADD; (2) Mrs. Taylor was self-monitoring whether she was achieving therapeutic levels of Adderall, which can cause the precursor to a stroke by elevating blood pressure; (3) Dr. Steffek and Dr. Carley referred patients to each other; (4) Dr. Steffek was renting office space from Dr. Carley and treated Mrs. Taylor at that location; (5) Dr. Steffek and Dr. Carley would discuss mutual patients, of which Mrs. Taylor was one; and (6) Dr. Carley knew about Mrs. Taylor's Adderall prescription. Mrs. Taylor also alleged, "Plaintiff [Mrs.] Taylor's neurologist upon admittance at Northeast Medical Center Hospital, Dr. Massoud Bina, suspected that her stroke was due to amphetamine toxicity. Further, it is

Plaintiff's psychiatrist expert's opinion that the high dosage of Adderall prescribed by Dr. Steffek caused [Mrs.] Taylor's stroke."[8]

Without stating the grounds, the trial court granted Dr. Carley's summary-judgment motion on all claims the Taylors asserted against him. The trial court subsequently severed the claims against Dr. Carley from the Taylors' claims against the remaining defendants, thus making the judgment final as to Dr. Carley.

## II. Issue Presented and Standard of Review

In a single issue the Taylors allege the trial court erred in granting summary judgment on unspecified grounds when the summary-judgment evidence established that Dr. Carley owed Mrs. Taylor a duty arising from the psychologist-patient relationship as a matter of law and, at a minimum, raised fact issues regarding (1) whether Dr. Carley breached that alleged duty by misdiagnosing Mrs. Taylor's condition, and (2) whether Mrs. Taylor suffered damages as a result of medication prescribed by the psychiatrist to whom Dr. Carley referred Mrs. Taylor in foreseeable reliance on the alleged misdiagnosis.

In reviewing a traditional motion for summary judgment, we take as true all evidence favorable to the non-movant, and we make all reasonable inferences in the non-movant's favor. *Dolcefino v. Randolph*, 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the non-movant to raise a genuine, material fact issue sufficient to defeat summary judgment. *Id.*

8. (footnotes omitted).

In reviewing a no-evidence motion for summary judgment, we ascertain whether the non-movant produced any evidence of probative force to raise a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Id.* We take as true all evidence favorable to the non-movant, and we make all reasonable inferences therefrom in the non-movant's favor. *Id.* A no-evidence motion for summary judgment must be granted if the party opposing the motion does not respond with competent summary-judgment evidence that raises a genuine issue of material fact. *Id.* at 917. When the trial court does not specify the grounds for its ruling, we affirm if any of the grounds advanced in the motion has merit. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). Because Dr. Carley moved for summary judgment on both traditional and no-evidence grounds and the trial court did not specify which it granted, we can uphold the summary judgment on either ground. *See Bruce v. K.K.B., Inc.,* 52 S.W.3d 250, 254 (Tex.App.-Corpus Christi 2001, pet. denied); *see also FNFS, Ltd. v. Sec. State Bank & Trust,* 63 S.W.3d 546, 548 (Tex. App.-Austin 2001, pet. denied); *Barraza v. Eureka Co.,* 25 S.W.3d 225, 231 (Tex. App–El Paso 2000, pet. denied).

### III. ANALYSIS

#### A. The Taylors' Assertions and General Negligence Elements

▇▇▇ The Taylors contend Dr. Carley was negligent in two ways: (1) misdiagnosing Mrs. Taylor's condition, and (2) failing to monitor the side-effects of the Adderall, which Dr. Steffek prescribed.[9] The ele-

ments of a negligence claim are existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *IHS Cedars Treatment Ctr. of Desoto, Texas, Inc. v. Mason,* No. 01-0926, 47 Tex. Sup.Ct. J. 666, 668, 2004 WL 1396194, at *3 (Tex. June 18, 2004). The threshold inquiry is duty. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex. 1995). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996).

#### B. Proximate Cause and Dr. Carley's Alleged Misdiagnosis

▇▇▇ A reviewing court may assume the existence of a duty and resolve the appeal on the basis of one of the other elements, such as proximate cause. *See Mason,* 47 Tex. S.Ct. J. at 666, 2004 WL 1396194, at *1 (doing so in context of reviewing summary judgment). The two elements of proximate cause are cause in fact and foreseeability. *Mason,* 47 Tex. S.Ct. J. at 668, 2004 WL 1396194, at *3. These elements cannot be satisfied by mere conjecture, guess, or speculation. *Id.*

▇▇▇ "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* That the harm would not have occurred without an actor's negligence is a necessary, but not sufficient, factor. *See id.* Thus, cause in fact is not established when a defendant's negligence does no more than furnish a condition that

---

9. Although the Taylors raised both misdiagnosis and failure to monitor in the trial court, their position on appeal is less clear. They state, for example, "[Dr. Carley] owed a duty to Ms. Taylor not to misdiagnose her condition and, *arguably,* his duty extended to moni-

tor her progress on the medication and report his impressions to Dr. Steffek during the course of their joint treatment." (Emphasis added.) Nevertheless, we address both the alleged misdiagnosis and the alleged failure to follow.

makes the injuries possible. *Id.* "The evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries .... [and] justify the conclusion that such injury was the natural and probable result thereof." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (quotations omitted). Accordingly, even if an injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause. *Id.*

Foreseeability means the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act created for others. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Foreseeability, however, does not require a person to anticipate the precise manner in which injury will occur once the person creates a dangerous situation through his negligence. *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Id.*

When events intervene between the alleged negligent act and the injury, a question may arise whether such events constitute superseding causes that break the causal connection between the act and the injury. As the San Antonio Court of Appeals has explained:

> Texas courts distinguish between a new and independent cause and a concurrent act. A concurrent act cooperates with the original act in bringing about the injury and does not cut off the liability of the original actor. A "new and independent cause," sometimes referred to as a superseding cause, however, is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury.

*Benitz v. Gould Group*, 27 S.W.3d 109, 116 (Tex.App.-San Antonio 2000, no pet.) (citations omitted).

In determining whether an intervening force rises to the level of a superseding cause, Texas courts consider the following six factors:

- the fact the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
- the fact the intervening force's operation or its consequences appear after the event to be extraordinary, rather than normal, in view of the circumstances existing at the time of the force's operation;
- the fact the intervening force is operating independently of any situation created by the actor's negligence or is not a normal result of such a situation;
- the fact the operation of the intervening force is due to a third person's act or to his failure to act;
- the fact the intervening force is due to an act of a third person that is wrongful toward the other and thus subjects the third person to liability to him; and
- the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*See Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex.1999). The issue of new and independent cause is a component of the ultimate issue of proximate cause and not an affirmative defense. *Rodriguez v. Moerbe*, 963 S.W.2d 808, 821 n. 12 (Tex. App.-San Antonio 1998, pet. denied).

In the present case, the Taylors alleged the following causal chain: (1) Dr. Carley misdiagnosed Mrs. Taylor as having ADD/ADHD; (2) Dr. Carley then referred Mrs. Taylor to Dr. Steffek; (3) Dr. Steffek also misdiagnosed Mrs. Taylor as having ADD/ADHD; (4) Dr. Steffek prescribed Adderall for Mrs. Taylor's condition and had Mrs. Taylor self-monitor the effects of the medication; (5) Mrs. Taylor took more than the recommended dose of Adderall; and (6) the Adderall caused Mrs. Taylor to have adverse side effects and eventually suffer a stroke. Thus, according to the Taylors' allegations, at least three events intervened between Dr. Carley's diagnosis and Mrs. Taylor's stroke: (1) Dr. Steffek's independent diagnosis; (2) Dr. Steffek's prescription of the Adderal; and (3) Mrs. Taylor's taking more than the recommended dose of the medication. As alleged, the intervening acts implicated, at a minimum, factors three (independent action of intervening force), four (operation of intervening force as a result of a third person's act), five (wrongfulness of third person's act), and six (degree of culpability of third person) of the six superseding-cause criteria set forth above.

In the no-evidence part of his summary-judgment motion Dr. Carley contended there was no evidence of proximate cause. Dr. Carley specifically alleged, among other things, that there was no evidence (1) Dr. Carley prescribed Adderall to Mrs. Taylor; (2) Dr. Steffek based his decision to prescribe Adderall to Mrs. Taylor in whole or in part on Dr. Carley's findings or diagnosis of ADHD; (3) Dr. Carley knew or should have known of the potential adverse consequences of the drug Adderall upon Mrs. Taylor; and (4) Dr. Carley knew or should have known of adverse symptoms or effects suffered by Mrs. Taylor following her taking of this medication.[10] Thus, Dr. Carley's no-evidence allegations particularly challenged the Taylors to produce proof of the foreseeability component of proximate cause.

In response, the Taylors presented summary-judgment evidence, which they summarized as follows:

> Adderall is an amphetamine and a Schedule II narcotic which can become addictive. Beverly Taylor was reporting headaches and weight loss to Defendant Steffek. Beverly Taylor was subscribed [sic] Adderall for her misdiagnosed ADD. She was self monitoring whether she was achieving therapeutic levels. Adderall can cause the precursor to a stroke by elevating her blood pressure. Defendant Steffek treated patients, including Beverly Taylor, at Dr. Carley's office on Thursdays. Dr. Steffek was renting space from Dr. Carley. They would refer patients to each other. Dr. Steffek has referred ADHD patients to Dr. Carley before. When Dr. Steffek was in Dr. Carley's office on Thursday's [sic] he would sit down and have a conversation about their mutual patients. Beverly Taylor was a mutual patient.[11] Dr. Carley knew she was being prescribed Adderall.[12] Dr. Carley's breach

10. In his summary-judgment motion, Dr. Carley did not allege an absence of evidence to show Adderall caused the stroke. Our review is limited to the grounds asserted. *See Gold v. City of College Station*, 40 S.W.3d 637, 642 n. 3 (Tex.App.-Houston [1st Dist.] 2001, pet granted, judgm't vacated w.r.m.).

11. In support, the Taylors cited only Mrs. Taylor's deposition in which she described

her visits with Dr. Steffek. There is nothing in the cited deposition pages to indicate how long Mrs. Taylor was a mutual patient.

12. In support, the Taylors cited Dr. Carley's deposition in which he testified as follows:

> Q. So, before January 6th, 1999 you did not know she was taking Adderal [sic]?
> A. Correct, until she came and had it with her on that day.

of the standard of care in making the diagnosis of ADD and referring her for medication treatment was a cause of the ultimate damages and injuries sustained by the Plaintiffs herein.[13] Plaintiff Taylor's neurologist upon admittance at Northeast Medical Center Hospital, Dr. Massoud Bina, suspected that her stroke was due to amphetamine toxicity. Further, it is Plaintiff's psychiatrist expert's opinion that the high dosage of Adderall prescribed by Dr. Steffek caused Beverly Taylor's stroke.[14] Adderall would not have been prescribed if her anxiety disorder had not been misdiagnosed by Dr. Carley.[15] (original footnotes deleted; present footnotes added by this court.)

The Taylors have not produced any summary-judgment evidence showing (1) that Dr. Steffek based his decision and treatment on Dr. Carley's diagnosis, or (2) that Dr. Carley knew or should have known of the potential adverse consequences of Adderall on Mrs. Taylor. In light of Dr. Steffek's and Mrs. Taylor's roles in the chain of events and the lack of evidence that Dr. Steffek's allegedly wrongful act was a concurrent act, as opposed to a new and independent cause, Mrs. Taylor's summary-judgment evidence is insufficient to raise a genuine issue of fact on the element of proximate cause.

At oral argument, the Taylors directed this court's attention to *Benitz,* 27 S.W.3d at 116–17 and *Wilson v. Brister,* 982 S.W.2d 42, 44–45 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). In those cases, the appellate courts were reviewing the grant of traditional summary judgment motions in which the defendants shouldered the burden of conclusively proving the presence of a superseding cause. *See Benitz,* 27 S.W.3d at 117; *Wilson,* 982 S.W.2d at 45. They are not persuasive authority for deciding the appropriateness of a no-evidence summary judgment in the present case. *See Phan Son Van,* 990 S.W.2d at 753 n. 2 (stating, if defendant moves for no-evidence summary judgment based on lack of foreseeability, it will be plaintiff's burden to provide summary-judgment evidence of foreseeability).

## C. Duty and Dr. Carley's Alleged Failure to Monitor Mrs. Taylor's Reaction to Adderall

Mrs. Taylor contends Dr. Carley had a duty to monitor Mrs. Taylor's progress on the medication Adderall and to report his impressions to Dr. Steffek. According to Mrs. Taylor's deposition testimony, she

Q. Right, right. No one had told you that that was going to be prescribed to your patient.
A. Not at that time.

13. In support, the Taylors cited the affidavit of Dr. Ron Kimball, Ph.D., in which he opined that Dr. Carley's failure "to follow proper standards in the assessment, diagnosis and development of a treatment plan ... resulted in the misdiagnosis of ADHD, the use of Adderall, and the development of an amphetamine toxicity that was implicating in a disabling CVA." Dr. Kimball provided no facts to support the causal connection between the alleged misdiagnosis and the subsequent events. Affidavits containing conclusory statements unsupported by facts are not competent summary-judgment evidence.

*Skelton v. Comm'n for Lawyer Discipline,* 56 S.W.3d 687, 692 (Tex.App.-Houston [14th Dist.] 2001, no pet.). The Taylors contend by not objecting to Dr. Kimball's affidavit, Dr. Carley has waived any objection on appeal. An objection regarding the conclusive nature of an affidavit, however, is an objection to the substance of the affidavit that can be raised for the first time on appeal. *Id.*

14. As discussed in note 10, above, in his summary-judgment motion, Dr. Carley did not contend there was an absence of evidence to show Adderall caused the stroke.

15. The Taylors cited no summary-judgment evidence in support of this contention.

saw Dr. Carley only twice after she began taking the Adderall. She did not tell Dr. Carley about any problems with medications or side effects. At the second visit, she told Dr. Carley she was "doing well." When she started experiencing headaches and weight loss, she was no longer seeing Dr. Carley.

The narrow question in this case, therefore, is whether a psychologist has a duty to monitor or follow the progress of a former patient who is no longer seeing the psychologist but is seeing a physician to whom the psychologist referred the patient. The Taylors cite no authority to support such a duty, and we have found none. We decline to create a new duty not recognized by Texas law. *See T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n,* 79 S.W.3d 712, 720 (Tex. App.-Houston [14th Dist.] 2002, pet. denied).

## IV. CONCLUSION

Having concluded that there is no evidence Dr. Carley's alleged negligence in diagnosing Mrs. Taylor proximately caused Mrs. Taylor's injury and that Dr. Carley had no duty to follow or monitor Mrs. Taylor's condition after she stopped seeking treatment from him, we overrule the Taylors' sole issue on appeal. Accordingly, we affirm the trial court's judgment.