In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00044-CV
______________________________


EBENY GIVENS, INDIVIDUALLY AND AS NEXT FRIEND OF
TONI J. WRIGHT, A MINOR, AND KEITH WRIGHT, 
INDIVIDUALLY, Appellants
 
V.
 
M&S IMAGING PARTNERS, L.P., BAPTIST IMAGING CENTER,
M&S IMAGING PARTNERS I, INC.,
AND GWENDOLYN DAIGLE, Appellees


                                              

On Appeal from the 57th Judicial District Court
 Bexar County, Texas
Trial Court No. 2005C102081


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N
            In this appeal from a defense summary judgment, we are called on to revisit the recurring
question of how attenuated the link can be between an allegedly negligent behavior and damage
allegedly caused by that behavior, before the actor is no longer legally responsible for the damage. 
Simplifying this appeal, most of the defendants previously involved in this case are not before us:
we are focused on the alleged negligence of an actor at the very beginning of a rather involved chain
of alleged causation.
            The allegedly negligent behavior was Gwendolyn Daigle's production of an ultrasound image
of Ebeny Givens' uterus revealing the unborn Toni Wright—and Toni's unborn sibling—as well as
Givens' cervix. Onto this allegedly substandard ultrasound image, Daigle had superimposed her
apparently incorrect measurement of Givens' cervix, indicating the cervix was significantly longer
than it really was. In a prior pregnancy, Givens had been diagnosed with a short cervix


 and given
a cervical cerclage—sutures around the cervix to strengthen a short or incompetent
cervix


—allowing her to successfully carry a former pregnancy to term. Givens was not given a
cerclage in this case.
            The prematurely born Toni remained hospitalized for months after her birth, during which
time Toni fell prey to a congestive lung condition and Givens incurred large medical expenses for
Toni's care, both of which are problems often associated with premature births. Toni's lung
condition continued after she was released to go home, where she continued to need a breathing tube
and where her care was assisted by a home healthcare agency. The sad end to this part of Toni's
story occurred later at her home, when her breathing tube clogged—a blockage not easily or quickly
cleared—temporarily denying Toni oxygen and leaving her with severe brain damage. In this case,
we consider the attenuation between Daigle's allegedly negligent behavior and two types of damage:
(1) the medical expenses incurred during Toni's initial hospitalization and (2) Toni's brain damage.
            Daigle and her codefendants filed a joint motion for summary judgment in which they alleged
that their evidence conclusively negated an essential element of Givens' case: proximate cause. 
Alternatively, they asserted that Givens had presented no summary judgment evidence that any act
or omission by Daigle was a proximate cause of the damages. The trial court granted the motion. 
We affirm the summary judgment because, based on the summary judgment evidence, as a matter
of law, Daigle's alleged negligence is too attenuated from either type of damage alleged.
Standard of Review
            In this case, we determine whether the summary judgment evidence presented to the trial
court contained any evidence showing Daigle's actions were a proximate cause of the damages, or
alternatively, if the series of events shown by that evidence showed, as a matter of law, that Daigle's
actions were not a proximate cause of the damages.
            In a traditional motion for summary judgment, the party moving for summary judgment
carries the burden of establishing that no genuine issue of material fact exists and that it is entitled
to judgment as a matter of law. See Tex. R. Civ. P. 166a(c); Rhone-Poulenc, Inc. v. Steel, 997
S.W.2d 217, 223 (Tex. 1999). When reviewing a summary judgment, we take as true all evidence
favorable to the nonmovant. See Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997). 
We indulge every reasonable inference to resolve any doubts in the nonmovant's favor. Id. A
defendant who conclusively negates at least one of the essential elements of the plaintiff's cause of
action is entitled to a summary judgment. Little v. Tex. Dep't of Criminal Justice, 148 S.W.3d 374,
381 (Tex. 2004); Thomas v. Farris, 175 S.W.3d 896, 898 (Tex. App.—Texarkana 2005, pet. denied).
            A no-evidence summary judgment is essentially a pretrial directed verdict. We, therefore,
apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply
in reviewing a directed verdict. Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex.
2002); S. Disposal, Inc. v. City of Blossom, 165 S.W.3d 887, 895 (Tex. App.—Texarkana 2005, no
pet.). We must determine whether the nonmovant produced any evidence of probative force to raise
a fact issue on the material questions presented. S. Disposal, Inc., 165 S.W.3d at 895; Woodruff v.
Wright, 51 S.W.3d 727 (Tex. App.—Texarkana 2001, pet. denied). We consider all the evidence
in the light most favorable to the party against whom the no-evidence summary judgment was
rendered, disregarding all contrary evidence and inferences. Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997). A no-evidence summary judgment is improperly granted if the
nonmovant presents more than a scintilla of probative evidence to raise a genuine issue of material
fact. Jackson v. Fiesta Mart, Inc., 979 S.W.2d 68, 70–71 (Tex. App.—Austin 1998, no writ). More
than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable
and fair-minded people to differ in their conclusions." Havner, 953 S.W.2d at 711.
Proximate Cause and Attenuation
            Proximate cause consists of both cause in fact and foreseeability. Read v. Scott Fetzer Co.,
990 S.W.2d 732, 737 (Tex. 1998). Because, in this case, the motion for summary judgment asserts
there is no evidence Daigle's alleged negligence was a cause in fact of the injury, we address only
that element.
            Cause in fact is established when an act or omission was a substantial factor in bringing about
the harm, and, without it, the harm would not have occurred. Id.; Doe v. Boys Clubs of Greater
Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995); Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775
(Tex. 1995); Travis v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992); Purina Mills, Inc. v. Odell,
948 S.W.2d 927, 936 (Tex. App.—Texarkana 1997, writ denied). Cause in fact is not established
where a defendant's negligence does no more than furnish a condition which makes the injuries
possible. Doe, 907 S.W.2d at 477 (citing Bell v. Campbell, 434 S.W.2d 117, 120 (Tex. 1968)). In
other words, such conduct of a defendant is considered to be too attenuated from the resulting
injuries to the plaintiff to be a substantial factor in bringing about the harm. IHS Cedars Treatment
Ctr. v. Mason, 143 S.W.3d 794, 799 (Tex. 2004) (citing Doe, 907 S.W.2d at 477; Union Pump Co.,
898 S.W.2d at 776; Lear Siegler v. Perez, 819 S.W.2d 470, 472 (Tex. 1991)).
            While the Texas Supreme Court has repeatedly addressed attenuation between conduct and
liability, there remains a challenge on where to draw the line. Lear Siegler and Mason looked to the
Restatement (Second) of Torts for clarification on this issue:
a. Distinction between substantial cause and cause in the philosophic sense. In
order to be a legal cause of another's harm, it is not enough that the harm would not
have occurred had the actor not been negligent. Except as stated in § 432 (2), this is
necessary, but it is not of itself sufficient. The negligence must also be a substantial
factor in bringing about the plaintiff's harm. The word "substantial" is used to denote
the fact that the defendant's conduct has such an effect in producing the harm as to
lead reasonable men to regard it as a cause, using that word in the popular sense, in
which there always lurks the idea of responsibility, rather than in the so-called
"philosophic sense," which includes every one of the great number of events without
which any happening would not have occurred. Each of these events is a cause in the
so-called "philosophic sense," yet the effect of many of them is so insignificant that
no ordinary mind would think of them as causes.
Restatement (Second) of Torts § 431 cmt. a (1965) (emphasis added). This comment reinforces
the necessity of a reasonable, significant causal connection between the conduct and the harm, but
still does not specify where to draw the line.
            In addressing attenuation between conduct and liability, the Texas Supreme Court has
addressed scenarios similar to the one before us. See, e.g., Mason, 143 S.W.3d at 799; Union Pump
Co., 898 S.W.2d 773; Lear Siegler, 819 S.W.2d 470. In Mason, the court confirmed its ruling in
Bell, 434 S.W.2d at 117–18:
In Bell, three individuals were hit by a car while removing debris from an earlier car
accident. 434 S.W.2d at 118. Two of the men were killed, and the third suffered
serious injuries. Id. We held that the initial accident was not the proximate cause of
the deaths and injuries because it only created the condition that attracted the three
men to the scene and did not actively contribute to the injuries resulting from the
second accident. Id. at 122. Where the initial act of negligence was not the active
and efficient cause of plaintiffs' injuries, but merely created the condition by which
the second act of negligence could occur, the resulting harm is too attenuated from
the defendants' conduct to constitute the cause in fact of plaintiffs' injuries.

Mason, 143 S.W.3d at 799.
 
Our precedents establish that merely creating the condition that makes harm possible
falls short as a matter of law of satisfying the substantial factor test.

Id. at 800.
            In Taylor v. Carley, a summary judgment case, a patient's primary physician's negligent
conduct was held to be too attenuated, as a matter of law, from injuries caused by decisions of a
subsequent physician.


 Taylor, 158 S.W.3d 1. The Fourteenth District Court of Appeals stated that,
while the harm would not have occurred without the first doctor's negligent misdiagnosis and
referral, that negligent conduct was not dispositive. The court referenced the Texas Supreme Court's
holding in Mason that a cause in fact is not established when a defendant's negligence does no more
than furnish a condition that makes the injuries possible. Id. at 9. "The evidence must go further,
and show that such negligence was the proximate, and not the remote, cause of resulting injuries . . .
[and] justify the conclusion that such injury was the natural and probable result thereof." Id. (citing
Doe, 907 S.W.2d at 477). The court stated that, as a matter of law, the first doctor was not liable
because the plaintiff had not produced any summary judgment evidence showing (1) the subsequent
doctor based his decision and treatment on the first doctor's diagnosis, or (2) the first doctor knew
or should have known of the potential adverse consequences of the prescribed medication on the
patient. Taylor, 158 S.W.3d at 11. "In light of [the respective doctors'] roles in the chain of events
and the lack of evidence that [the second doctor's] allegedly wrongful act was a concurrent act, as
opposed to a new and independent cause, [the plaintiff's] summary-judgment evidence is insufficient
to raise a genuine issue of fact on the element of proximate cause." Id.; see also Martin v.
Commercial Metals Co., 138 S.W.3d 619 (Tex. App.—Dallas 2004, no pet.).



The Summary Judgment Evidence
            In effect, Givens alleges this chain of causation:
            1.         Daigle's substandard ultrasound image and inaccurate cervical measurement caused
the radiologist, Gregory Godwin, to prepare and transmit to Givens' obstetrician,
Robert A. Westbrook, an inaccurate or incomplete ultrasound report, which did not
report Givens' unduly short cervix.
            2.         That report caused Westbrook to miss, or not appreciate, the risk posed by Givens'
short cervix.
            3.         Westbrook, therefore, failed to give Givens a cervical cerclage.
            4.         Because Givens had no cerclage, Toni and her sibling were born prematurely.
            5.         Toni's premature birth created a propensity for Toni to have an extended
hospitalization and to contract a congestive lung disease.
            6.         Toni contracted such a disease while she was hospitalized.
            7.         Toni's lung disease extended her hospitalization and required her to have a breathing
tube.
            8.         Some time after Toni went home, her breathing tube occluded.
            9.         The breathing tube occlusion was not easily or quickly cleared.
            10.       Therefore, Toni was deprived of oxygen to her brain for a period of time.
            11.       Toni sustained serious brain damage.



            As presented, in this case the summary judgment evidence shows that Daigle conducted an
ultrasound on Givens during the course of her pregnancy. There was conflicting evidence as to
whether the ultrasound was done properly, and about the quality of the result. The radiologist,
Godwin, testified by deposition that he did an independent review of the films taken by Daigle, that
the cervix was well visualized, that he did not rely on her measurements of the cervix in making his
report, and that he did not report on the cervical length to Givens' obstetrician.
            We have before us what is essentially an undisputed sequence of events, with conflict
concerning whether Daigle negligently used the ultrasound machine in obtaining an image. The
question is, under this state of the evidence, has Daigle conclusively proven that any such negligence
was not a cause in fact of the damages alleged, or has Givens failed to present any evidence of such
a causal connection.
Application to the Damages Sought
            The easier attenuation issue relates to Toni's clogged tube: the link between Daigle's
ultrasound and Toni's brain damage is far too attenuated to support liability. When all acts and
omissions have run their course and are complete, the alleged negligence cannot actively contribute
in any way to the injuries involved in this suit. Bell, 434 S.W.2d at 122. Here, the alleged
negligence by Daigle, the ultrasound, was not the active cause of the brain damage from the clogged
tube. At most, the ultrasound merely created a condition by which one or more subsequent acts of
negligence could occur, and the brain damage which flowed from, or occurred after, the doctor's and
home health agency's subsequent act or acts is too attenuated from Daigle's conduct for that conduct
to be the cause in fact of Toni's brain damage. See Mason, 143 S.W.3d at 799 (citing Bell, 434
S.W.2d at 122).
            Because there are not as many intervening factors, it is not as clear that Daigle's conduct in
performing the ultrasound is too attenuated from Toni's premature birth and the accompanying
medical bills to support liability.
            But Givens has not shown that Godwin's failure to report to Westbrook on Givens' cervix
length in any way flowed from Daigle's ultrasound services. Godwin stated that he did not rely on
the cervix measurements collected by Daigle and that Givens' cervix was "well visualized" in the
ultrasound images. The evidence does not raise a genuine issue of material fact as to whether her
acts were concurrent with any subsequent negligence, which would be necessary to avoid a
conclusion that they were attenuated as a matter of law.
            Providence Health Ctr. v. Dowell also relied on the holdings in Mason and Union Pump Co.
to decipher whether a hospital could be held liable for the suicide of a recently released patient. 
Providence Health Ctr. v. Dowell, 167 S.W.3d 48 (Tex. App.—Waco 2005, no pet.). Lance Dowell
was taken by Freestone County sheriff's deputies to Providence Health Center because he had
self-inflicted wounds and was talking about committing suicide. Id. at 51. Following a physical
assessment at the emergency room, Dr. James Pettit requested a psychological assessment from the
DePaul Center, which is affiliated with Providence. Sister Mary Theresa Fox, a joint employee of
Providence and DePaul, evaluated Lance's condition and determined he was not "actively suicidal." 
Id. Lance was discharged from the hospital and went to his mother's home in Waco. Later that day,
Lance went first to Lake Limestone and then to Fairfield with his brother to a rodeo, before later
visiting with friends. Id. On Sunday, he attended a family reunion and made plans with his brother
to meet at a party that night. On Sunday evening, Lance hung himself. Id.
              The Waco Court of Appeals interpreted the opinions in Mason, Union Pump, and Lear
Siegler as saying that a court may, as a question of law, weigh competing policy considerations and
define the limits of legal causation by "fixing the line between immediate results and remote results"
of wrongful acts. Dowell, 167 S.W.3d at 56. The court weighed the factors Providence offered as
proof of attenuation: (1) Lance appeared to be perfectly normal when he was discharged; (2) no one
knows precisely why he killed himself; (3) thirty-six hours passed between his discharge and suicide;
(4) it is just as likely that a new and unknown event triggered his suicide; (5) a proper examination
could not have guaranteed hospitalization—because Lance might not have consented to stay—and
(6) hospitalization would not have guaranteed that treatment would have prevented the suicide. Id. 
"None of these factors, nor all of them together, conclusively prove that the negligence attributable
to Providence was too remotely connected to Lance's suicide to constitute legal causation." Id. The
court affirmed the trial court's assessment of negligence, including Providence's negligence. Id. at
51.
            Daigle's factors are analogous, yet we see Daigle's actions as being significantly more
attenuated: (1) Godwin did not rely on Daigle's ultrasound when issuing his report, (2) Godwin
made his own assessment of the cervical length, (3) Godwin deemed the ultrasound images sufficient
for his purposes, (4) other examinations occurred between the ultrasound and the birth, and (5) a
review of Givens' medical records would have shown her being administered a cervical cerclage in
the past. Collectively, these factors impose an impressive array of intervening factors such that
Daigle's actions were too remotely connected to Toni's premature birth.
            In this case, while Daigle's alleged negligence may have contributed to the premature birth,
her actions could not and did not control over the ultimate medical decisions by Givens' doctors. 
The evidence shows that there were other assessments and opportunities where the shortened cervix
should have been discovered and dealt with. Daigle's acts, although arguably contributory, are too
attenuated and remote from the premature birth to be deemed a cause in fact, and, as such, these
defendants were properly granted summary judgment.
            We affirm the judgment of the trial court.
 

                                                                        Josh R. Morriss, III
                                                                        Chief Justice

Date Submitted:          April 19, 2006
Date Decided:             June 13, 2006