Abel ARGUELLES, Laura Arguelles, Terrie A. Augustino, Petra Renee Barfield, William A. Barfield, Adolph Brown, Desmond Burnett, Dora A. Burnett, Ricky A. Carter, Carl Ray Crane, Dennis M. Curry, Stephanie L. Curry, Paul Kevin Cutrer, Sondra Dorflinger Cutrer, Christy Durden, Randal William Durden, Arthur Escobedo, Janie Escobedo, Derek Todd Evett, Kimberly Evett, Karen George, Rocky D. George, Lino A. Gonzalez, Marie S. Gaynor Gonzalez, Bertha Guidry, Lambert Guidry, Larry C. Hammans, Miranda Hammans, Maurice F. Hodge, John B. Jackson, Jimmy Ray Jones, Vicky Renee Jones, Diana Kelly, Jerry W. Kelly, Diana Kelly, Jerry W. Kelly, George P. La Fear, Sherry Elizabeth La Fear, Dan Q. Lam, Amy Marie Lam, Hilda M. Lewis, Anna Laura Martinez, Baldemar Gonzalez Martinez, Angela L. Mercier, Terry Martin Mercier, Edna Ann Norman, Michael J. Norman, Cheryl J. Reedy, Michael Reedy, Betty Saenz, Gilberto M. Saenz, James Aaron Shankle, Marchelle D. Watkins, Angela Kay Williams, Brenda Castle Williams, Darrell E. Williams, Jessie Mae Williams, Lonzy Williams, Mary Ann Williams, Reginald Calvin Williams, Timothy Owen Williams, Pacific Employers Insurance Company, Adarienne Bradley, Jack W. Christy, Michael Edward Cole, Rodolfo Coma, Douglas Counts, William De La Vergen, Jackie Edwards, Richard E. Friday, Nick Garcia, Ignacio Garza, Brian Gibson, Fidencio Gonzalez, Joseph E. Gonzalez, Roy Guerra, David Hernandez, Derek W. Holmes, Barry Holcomb, Marilyn G. Jones, Gerald Lohse, Earl McPherson, Danny Meadows, Jr., Michael Morales, Forrest E. Probst, Leon Ritter Jan Allen Stewart, Kenneth Vance, Angela Ann Vaydik, David Yeary, and Tony Latayne Gott, Individually and as Executrix of the Estate of Rodney Gott, Appellants

v.

KELLOGG BROWN & ROOT, INC., Individually and as Successor in Interest to the M.W. Kellogg Company, and Halliburton Company, Individually and as Successor in Interest to the M.W. Kellogg Company, Appellees.

No. 14–04–01022–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 27, 2007.

Richard N. Countiss, Jim S. Hart, John E. Williams Jr., Michael W. Cramer, and Robert E. Ammons, Houston, for appellants.

Craig Joseph Ledet, Gregory Karl Evans, H. Victor Thomas, R. Bruce Hurley,

Reagan W. Simpson, and Robert E. Meadows, Houston, for appellees.

Panel consists of Justices ANDERSON, EDELMAN, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

This case arises from a terrible explosion and fire at a large chemical complex, resulting in personal injury to many workers. After some of the injured workers filed negligence claims against companies that allegedly had provided services to their employer, the trial court rendered a summary judgment that the workers take nothing on their claims against the service providers. On appeal, the workers assert that the judgment in favor of the service providers lacks finality and that the trial court erred in granting summary judgment because (1) there is substantial evidence the service providers owed the workers a duty of care, (2) there is substantial evidence the service providers' alleged negligence was a proximate cause of the workers' injuries, (3) there is substantial evidence the employer's actions leading up to the explosion were not a new and independent cause of the explosion, and (4) there are fact issues on all matters raised by the service providers. We conclude the judgment is final. We also conclude that, as a matter of law under the applicable standard of review, any breach of the duties owed by the service providers did not proximately cause the workers' injuries. Accordingly, we affirm the trial court's judgment.

## I. FACTUAL BACKGROUND[1]

Phillips Petroleum Company initiated operation of the K–Resin Unit in Phillips Petroleum Company's Houston Chemical Complex (hereinafter "K–Resin Unit") in 1978 to produce a styrene-butadiene block copolymer called "K–Resin." K–Resin is a clear, flexible plastic that has many uses in the food and medical packaging industries. Understanding the K–Resin manufacturing process and the operation of the K–Resin Unit is essential to the proper resolution of the issues in this appeal.

### A. The K–Resin Process

One of the raw materials used in the reactors at the K–Resin Unit is a diene monomer called 1,3–butadiene (hereinafter "butadiene"). Because it is a monomer, butadiene will polymerize or react with itself. The butadiene arrives at the K–Resin Unit by a dedicated pipeline and is stored in a 200,000–gallon spherical tank. As it arrives through the pipeline and is stored in this tank, the butadiene contains an inhibitor called "TBC" that inhibits butadiene from reacting with itself to form polymers.[2] Butadiene that contains such an inhibitor is called inhibited or wet butadiene, and butadiene that lacks any such inhibitor is called uninhibited or dry butadiene. The wet butadiene in the spherical tank recirculates continuously through a refrigerated chiller to maintain a temperature of approximately 45 degrees Fahrenheit. The presence of the inhibitor in the butadiene and the low temperature prevent the butadiene from reacting with itself to form polymers while it is stored in the spherical tank.

To create the desired product, steps are taken to ensure the butadiene is free of inhibitor before it is fed to the reactors. The wet butadiene is moved from the spherical tank to activated alumina

---

1. The facts set forth in this section are all based on the summary-judgment evidence under the familiar summary-judgment standard of review.

2. The K–Resin process described in this opinion is the one in use at the time of the occurrence made the basis of this suit.

molecular sieves or dryers, which remove impurities, including inhibitor, from the butadiene. Because the dry butadiene is normally fed to the reactors intermittently and because there are usually several reactors in operation, the dry butadiene is distributed to either the East or the West Dry Butadiene Tank to ensure that there is adequate dry butadiene to feed to the reactors.

At the time of the explosion, each of the Dry Butadiene Tanks was eight feet in diameter and approximately forty feet tall. Each tank had a capacity of 13,000 gallons. Only one Dry Butadiene Tank was used at a time. When a tank was not in service, Phillips employees would empty it, remove a form of butadiene polymer known as "popcorn polymer" from inside, and then place the tank on stand-by to go into service in place of the other tank. The dry butadiene in the tank that is in service circulates continuously through a charge filter and then a chiller. The filter removes rust, polymers, and any other particulates that may be in the dry butadiene. The cooler keeps the butadiene cool while the substance is awaiting transfer to the reactors. This low temperature is necessary to prevent the butadiene from reacting with itself to form polymers while it is being stored in the Dry Butadiene Tanks. While butadiene has a tendency to react with itself to form various polymers, at low temperatures the rates of these reactions are very slow. However, as the temperature increases, the reaction rates increase rapidly.

The Dry Butadiene Tank being used to feed the reactors is isolated from the other tank as the dry butadiene is pumped to the reactor as and where needed. The Butadiene Charge Pump moves the dry butadiene through a charge filter to a reactor. In the reactor, the dry butadiene is combined with styrene to produce K–Resin.

## The Danger of Popcorn Polymerization in Dry Butadiene

"Popcorn polymer" is a butadiene polymer in which there is considerable cross-linking within the polymer. This cross-linking causes the popcorn polymer to be hard and also insoluble in the butadiene. Popcorn polymer grows when the molecular bonds in its cross-linked structure break to form an active site where butadiene can react, attach, and become part of the popcorn. This growing process causes a popping sound, which is the origin of the name "popcorn polymer." As the popcorn polymer grows, stresses are formed within the popcorn that cause additional bonds to break and form more active sites, which can cause further growth of the popcorn polymer. The formation of popcorn polymer is only a problem in the part of the K–Resin process that occurs after the butadiene passes through the dryers. Before this point in the process, the butadiene contains inhibitor, which prevents popcorn growth. But after the butadiene passes through the dryers into the Dry Butadiene Tanks, the butadiene has no inhibitor, and popcorn polymer can form. Butadiene's ability to react with itself to form popcorn polymer affects temperature, and, more importantly, pressure.

At any given time, a Dry Butadiene Tank containing butadiene contains a combination of liquid and vapor butadiene in the tank. "Popcorn seeds" form when small amounts of oxygen are allowed into the tank. The reaction that creates a popcorn seed liberates heat. Once the popcorn seed forms, it is then free to react with the dry, liquid butadiene that surrounds it. By reacting with the surrounding liquid butadiene, the popcorn seed can grow. Each reaction in which the popcorn seed grows liberates heat. Consequently, the continuing popcorn polymer growth generates heat that increases the tempera-

ture inside the tank. Temperature increases, in turn, cause the pressure inside the tank to increase. The rate of growth of popcorn polymerization accelerates as the temperature and pressure increase inside the tank. Because the growth of popcorn polymerization increases temperature and pressure, this process feeds on itself. Once the temperature and pressure inside the tank reach high enough levels, the reaction rate continues to accelerate until it eventually accelerates very rapidly. This rapid acceleration, in turn, causes the pressure to increase dramatically in a very short period of time. This rapid increase in pressure can rupture the vessel in which the butadiene self-reactions are occurring.[3]

### The Pressure Safety Valves on the Dry Butadiene Tanks

Because of the danger of overpressurization, the East Dry Butadiene Tank ("East Tank") had a pressure safety valve ("Safety Valve"), a safety device located near the top of the tank that was designed to protect the tank from failing due to overpressure. Once the pressure inside the East Tank reached a certain level—85 psi—the Safety Valve automatically would lift to relieve pressure from inside the tank. Automatic activation of the Safety Valve would allow the butadiene vapor to flow out of the tank and move on to the flare, a process that would dispose of the butadiene safely. The Safety Valve, however, could be disabled. Located downstream of the Safety Valve was a block valve ("Block Valve"). Closing the Block Valve disabled the Safety Valve. Although the Safety Valve might lift when the pressure inside the tank reached 85 psi, the Block Valve would not allow the pressure to exit the tank. Consequently, if the Safety Valve were disabled, pressure could continue to

increase inside the tank until the tank ruptured.

### B. The Explosion and Fire

To analyze the issues in this case, we must consider the events that occurred in the weeks preceding the explosion and fire in the Phillips complex on March 27, 2000. In mid-February 2000, the East Tank was in use; however, K–Resin unit personnel heard the popping sounds associated with the growth of popcorn polymer coming from inside the East Tank. In response, Phillips decided to take the East Tank out of service so that it could be emptied and cleaned of popcorn polymer. Accordingly, on February 19, Phillips took the East Tank off-line and put the West Dry Butadiene Tank ("West Tank") in service. Phillips operators isolated the East Tank from the process by closing various isolation valves. They then connected a nitrogen hose to the upper portion of the tank, connected a drain hose to the bottom of the tank, and pressured the liquid from the tank to a flare to be burnt off. This nitrogen purge was intended to remove the remaining liquid and vapor butadiene from the East Tank.

On March 4, the nitrogen purge was relocated to the bottom of the East Tank. Although Phillips was trying to isolate the East Tank, the operator did not realize that the isolation valve that normally would be used to isolate the East Tank from the West Tank had been severely leaking and that operators had been relying on an emergency isolation valve to separate the two tanks. Because the operator relied on the severely leaking valve and opened the emergency isolation valve, thousands of gallons of dry butadiene flowed from the West Tank back into the East Tank and the levels of the two tanks

3. Butadiene also reacts with itself to form "dimmers" and "trimer" in a reaction in

which the rate depends on the temperature and increases rapidly at higher temperatures.

equalized at approximately 32%. The emergency isolation valve was then closed and the butadiene level in the East Tank was lowered to approximately 27%. Also on March 4, in response to an isolation list issued by a Phillips employee, Phillips closed the Block Valve located downstream of the Safety Valve, thus disabling the Safety Valve.

From March 3 to March 6, the lower part of the East Tank was seen to be "iced over," indicating the presence of liquid, dry butadiene in the East Tank. On March 6, another K–Resin operator opened the emergency isolation valve between the East Tank and the West Tank, so that the levels in the two tanks again equalized. The K–Resin operators made various attempts to drain and clear the East Tank of butadiene. On March 14, while conducting a relief device audit, a Phillips maintenance supervisor observed that the Block Valve was still locked in the closed position, meaning that the Safety Valve was disabled. On March 16, a K–Resin operator observed a sweat line on the East Tank, indicating that it still contained liquid butadiene. The same day, a K–Resin operator observed a reading of 70–75 psi on a pressure gauge on the East Tank, indicating the operators had lost the nitrogen purge on the East Tank. On March 20, an operator heard popping sounds coming from inside the East Tank. On either March 25 or 26, an operator verified that the Block Valve was closed.[4] Additionally, on March 26, an operator observed a reading of between 70 and 75 psi on a pressure gauge for the East Tank, indicating that Phillips still had not established a nitrogen purge on the East Tank.

On March 27, the pressure inside the East Tank increased rapidly and there was a rupture and catastrophic failure of the East Tank at 1:22 p.m. This rupture released flammable butadiene and caused other tanks in the immediate area to rupture, releasing additional flammable material. This release of flammable material caused a fire that killed one person and severely injured several others. Other Phillips employees received lesser injuries. In a report Phillips issued following its investigation into this casualty, Phillips described this catastrophic failure on March 27 as follows:

> Vessel overpressure due to polymerization and dimerization within isolated vessel & no relief or cooling ... [East Tank] contained uninhibited [butadiene] for too long a period at ambient temperatures without cooling or adequate relief. Popcorn polymer was present.

After this deadly occurrence, the Block Valve was recovered and was found to be in the closed position.

## II. PROCEDURAL BACKGROUND

Various Phillips employees injured in the explosion and fire as well as various family members of some of these employees filed this suit asserting negligence claims against defendants/appellees Kellogg Brown & Root, Inc., Individually and as Successor in Interest to the M.W. Kellogg Company, and Halliburton Company, Individually and as Successor in Interest to the M.W. Kellogg Company (hereinafter collectively referred to as "Kellogg"). Other Phillips employees intervened asserting negligence claims, and Phillips's workers' compensation insurance carrier intervened asserting a subrogation claim. Any differences among the claims of these plaintiffs and intervenors are not material to the disposition of this appeal, and, for simplicity, all of the plaintiffs/appellants

---

4. In some places in the evidence, it states this occurred on March 25, in other places on March 26.

and intervenors/appellants are collectively referred to herein as the "Workers."

## A. The Workers' Negligence Claims

The Workers grounded their negligence claims against Kellogg on services Kellogg had provided to Phillips in 1995 and 1996, several years before the explosion. The Workers allege that Phillips hired Kellogg "to evaluate the pressure relief system and to consider and recommend all possible relieving scenarios for the K–Resin Unit." The Workers allege that knowing "the potential for and risks of popcorn polymer with dry butadiene, [Kellogg] failed to consider all credible overpressurization scenarios when evaluating the [dry butadiene storage tanks] at issue in this case." The Workers assert that the result of Kellogg's negligence "was an inadequate pressure relief and overpressurization detection system and the explosion and fire that severely injured [the Workers]." Based on these services, the Workers allege negligence against Kellogg, asserting the following in their live petition:

[Kellogg] proximately caused the incident complained of herein and the severe injuries to [the Workers] through the enumerated negligent acts or omissions:

1. Failure to consider all credible overpressurization scenarios for pressure relief system [sic] on the Dry [butadiene] storage tanks;

2. Failure to consider any scenario other than external fire or liquid overfill;

3. Failure to properly perform the overpressurization scenarios for external time [sic] and liquid overfill;

4. Failure to properly design the pressure relief valve and overpressurization detection system for the Dry [butadiene] storage tanks;

5. Failure to warn Phillips of the inadequacies of the pressure relief valve rupture disk and overpressurization detection system for the Dry [butadiene] storage tanks;

6. Failure to advise Phillips of engineering controls required to be implemented on reactive systems;

7. Failure to consider and recommend engineering solutions to prevent overpressurization;

8. Failure to identify the overpressurization risks of a highly reactive Butadiene system;

9. Failure to provide qualified engineers to complete the Design Project;

10. Failure to provide trained engineers to complete the Design Study;

11. Failure to train its engineers on the reactivity and hazards of Butadiene;

12. Failure to train and educate its engineers on the pressure relief design methods for reactive systems;

13. Failure to identify the proper maximum allowable working pressure on the dry butadiene storage tanks;

14. Failure to train and educate its engineers on engineering standards and codes applicable to preparing pressure relief designs for reactive systems;

15. Failure to consider and recommend alternative engineering safeguards in the event the pressure safety valve failed;

16. Failure to recognize and specify the proper rupture disk for the dry [butadiene] storage tanks;

17. Failure to advise Phillips to remove a rupture disk not speci-

fied for polymerization service; and

18. Failure to consider and recommend automatic engineering controls to prevent overpressurization and runaway reactions.

## B. The Summary Judgment Motions and Ruling

Kellogg filed motions for summary judgment,[5] asserting the following grounds:

### Traditional Summary–Judgment Grounds

(1) As a matter of law, Kellogg's contractual duty was limited to evaluating the size of the Safety Valve.

(2) If Kellogg's duty was so limited, then any alleged breach, as a matter of law, could not have proximately caused the Workers' injuries because, as a matter of law, the Safety Valve was disabled at the time of the incident.

(3) If, as the Workers contend, Kellogg's alleged duty extended to recommending additional engineering controls, any alleged breach of that duty, as a matter of law, could not have proximately caused the Workers' injuries because (a) it is impossible for the Workers to prove that Phillips would have adopted a recommendation that would have prevented this incident; (b) the evidence conclusively disproves the requisite element of causation; and (c) Phillips's own conduct was a new and independent cause.

### No–Evidence Summary Judgment Grounds

(1) There is no evidence Kellogg had any relevant duty other than to size the Safety Valve.

(2) There is no evidence any failure to properly size the Safety Valve caused the incident.

(3) There is no evidence that the disabling of the Safety Valve was foreseeable to Kellogg.

(4) There is no evidence Kellogg had any duty to recommend engineering controls to Phillips.

(5) Even if Kellogg's duty extended to recommending additional engineering controls, there is no evidence Phillips would have implemented any control that would have prevented this incident, nor is there any evidence of the requisite causal link between Kellogg's conduct and the incident.

The Workers responded to these motions with voluminous summary-judgment evidence, including two very lengthy experts' affidavits from Peter Howell and Georges Melhem, both chemical engineers. After striking substantial portions of these two affidavits, the trial court granted a take-nothing summary judgment against the Workers without specifying any ground. The Workers appeal.

## III. ISSUES PRESENTED

On appeal, the Workers assert the trial court erred in granting summary judgment. They identify under this single issue the following sub-issues:

(1) Does the trial court's judgment lack finality?

(2) Did the trial court err in granting summary judgment because there is substantial evidence Kellogg owed the Workers a duty of care?

(3) Did the trial court err in granting summary judgment because there is substantial evidence Kellogg's negli-

---

5. The motions reviewed on appeal are the "Amended Motions for Summary Judgment of Defendants, Kellogg Brown & Root, Inc. and Halliburton Company" filed on July 2, 2003.

gence was a proximate cause of the Workers' injuries?

(4) Did the trial court err in granting summary judgment because there is substantial evidence Phillips's actions were not a new and independent cause of the explosion? and

(5) Did the trial court err in granting summary judgment because there are fact issues on all matters raised by Kellogg?

## IV. STANDARDS OF REVIEW

■ In reviewing a traditional motion for summary judgment, we take as true all evidence favorable to the nonmovant, and we make all reasonable inferences in the nonmovant's favor. *Dolcefino v. Randolph*, 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *Id.*

■ In reviewing a no-evidence motion for summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence of probative force to raise a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Id.; Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–08 (Tex.2002). We take as true all evidence favorable to the nonmovant, and we make all reasonable inferences therefrom in the nonmovant's favor. *Dolcefino*, 19 S.W.3d at 916. A no-evidence motion for summary judgment must be granted if the party opposing the motion does not respond with competent summary-judgment evidence that raises a genuine issue of material fact. *Id.* at 917. When, as in this case, the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm

the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

## V. ANALYSIS

### A. Does this court have appellate jurisdiction?

In their first sub-issue, the Workers challenge this court's appellate jurisdiction by asserting the trial court's judgment lacks finality because Kellogg did not attack all of their theories for recovery under their negligence claims. The Workers note their allegations of eighteen different acts of alleged negligence. *See ante* at pp. 721–22. The Workers then argue that, in the motions for summary judgment, Kellogg challenged only seven of these acts of negligence and did not challenge the other eleven acts of negligence. Therefore, the Workers assert, the judgment lacks finality, citing *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191 (Tex.2001).

■ A judgment issued without a conventional trial is final only if it either actually disposes of all claims and parties before the court, or it states with unmistakable clarity that it is a final judgment. *See Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 192, 200 (Tex.2001). Kellogg did not assert a counterclaim against the Workers, and the trial court rendered judgment that the Workers take nothing on their claims, stating that it disposed of all claims asserted by the Workers. Although a second group of parties had intervened, asserting claims based on the same explosion against different defendants, the trial court severed all the Workers' claims against Kellogg into a separate case to make its summary judgment final. The trial court both actually disposed of all claims and parties before the court and

stated with unmistakable clarity that its judgment is final. Therefore, the trial court rendered a final judgment, and this court has appellate jurisdiction. *See id.; Ritzell v. Espeche,* 87 S.W.3d 536, 538 (Tex.2002) (holding that trial court's judgment was final because it stated that plaintiffs take nothing as to only claims pending in the case). Accordingly, we overrule the Workers' first sub-issue.[6]

## B. Did the trial court err in granting summary judgment because there is substantial evidence Kellogg owed the Workers a duty of care?

In their second sub-issue, the Workers argue the trial court erred in granting summary judgment as to Kellogg's grounds attacking duty because there is substantial evidence supporting the negligence duties the Workers allege Kellogg assumed under its contract to provide services to Phillips. In the relevant traditional summary-judgment ground, Kellogg essentially presumes for the sake of argument that Kellogg otherwise would owe a negligence duty to the Workers if it had a contractual obligation to Phillips; however, Kellogg asserts that its contractual obligation to Phillips as a matter of law did not go beyond evaluating the size of the Safety Valve and therefore any negligence duty based thereon is also so limited. The Workers assert the summary-judgment evidence raised a genuine fact issue as to a much broader duty assumed by Kellogg under its contract with Phillips.

Phillips and Kellogg did not execute a formal written contract for the services in question that Kellogg provided in 1995 and 1996 (hereinafter "Services"). Kellogg asserts that one document defines the scope of work and that the other is only an internal document that was never given to Phillips. Although there is summary-judgment evidence to support this position, during discovery both scope-of-work documents were produced from Kellogg's files. Under the applicable standard of review, we conclude there is a genuine fact issue as to whether the scope of Kellogg's contractual duty includes the services as described in both documents. Under the first of these two documents, Kellogg's scope of work is as follows:

- to organize all existing calculation sheets and specification sheets and compare them against a "K–Resin PSV Bypass Survey" for completeness,
- for "Relief Devices"[7] with existing specification and calculation sheets, (a) to tabulate the process conditions which had been utilized for Relief Device sizing and (b) using verified process conditions, to correct any discrepancies by updating the calculation and specification sheets and Mechanical Flow Sheets accordingly,

---

**6.** To the extent the Workers argue that the trial court's judgment is final but that the trial court erred on the merits in granting the motions because Kellogg did not explicitly attack all eighteen alleged acts of negligence, this argument also lacks merit. The Workers only asserted claims based on Kellogg's alleged negligence. Though they did allege eighteen acts of negligence, the grounds asserted by Kellogg, if meritorious, are sufficient to merit a dismissal of all the Workers' claims, notwithstanding the allegations of eighteen acts of negligence. To assert a summary-judgment ground against a claim, it is not always necessary to specifically attack every allegation in the nonmovant's petition. *See Lampasas v. Spring Center, Inc.,* 988 S.W.2d 428, 435–36 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding that motion for summary-judgment need not address every single allegation of negligence in plaintiff's petition and that summary judgment can be affirmed if motion and evidence show movant is entitled summary judgment as to all claims).

**7.** This term is not defined in the documents.

• for "Relief Devices" without existing specification and calculation sheets, (a) to tabulate any relief devices which do not have calculation or specification sheets and submit a request for process data for each of these devices to the K–Resin process engineer, and (b) to then develop calculation sheets and specification sheets based on the verified process information, with all equipment specifications to be verified against the field equipment,

• for all "Relief Devices," to make one copy of the final compilation for all relief devices and to send the "Record Copy" [8] to the Central Library,

• to make sure that all documentation and relief device sizing complies with Phillips Directives D–6–1 and D–6–2, which address, respectively, (a) the requirements and guidelines for documentation of pressure relief systems in new or modified facilities for processes covered by certain OSHA regulations, and (b) certain codes that shall be complied with in the engineering, design, procurement, and construction of pressure relief systems.

This document states that all documentation and relief-device sizing must comply with two Phillips directives. Contrary to arguments made by the Workers, this statement does not mean that Kellogg's scope of work included everything in these two directives. Nonetheless, the first directive does state that, in creating documentation "[a]pplicable and credible relief scenarios shall be investigated and documented." The directive continues:

Documentation shall include the scenario used to size each relief device as well as the scenarios used to size the relief

headers and flare or vent stacks. [9] Items to be included are:

1. Affected equipment,

2. Relief limiting instruments,

3. Depressuring system (process control),

4. Cause of overpressure (i.e., fire, process upset, etc.)

5. Calculated relief flow rates for each relief device affected, and

6. Calculations used to develop scenarios and flows.

Under the second document (the one Kellogg asserts was an internal memorandum), there is a genuine fact issue as to whether Kellogg's contractual duty also included the following tasks:

• examine relief capacities and conditions for each relief valve and include the different relief capacities and conditions on the specification sheet,

• check to see all relieving conditions are considered and that the proper trim or disk was used where you have both liquid and vapor relieving possibilities,

• provide additions or corrections to specifications and calculations,

• recommend new pressure safety valve or rupture disk specifications for problem valves

• review progress and findings at regular intervals with K–Resin Instrument Engineer.

In the trial court and on appeal, the Workers point to deposition testimony from various Kellogg engineers who state that Kellogg's scope of work required it to "look[ ] at all—all applicable causes" or "to check to see all relieving conditions are

8. This term is not defined in the documents.

9. This language appears to conflict with language in the first document stating that "[r]e-

lief header and flare/vent systems are NOT included" in the scope of work. However, we need not address this apparent conflict to dispose of this appeal.

considered." However, these statements add nothing to the statement in the second document that Kellogg should "[c]heck to see all relieving conditions are considered." [10]

Howell, one of the Workers' experts, testified that, in his opinion, various statements from the scope-of-work documents "tell a pressure relief design engineer that they are to determine the overpressure scenarios, from them determine the worst case scenario, and ensure that the pressure relief system can control that worst case scenario." Even if this were correct, Howell has no personal knowledge regarding Kellogg's scope of work and the scope-of-work documents. Moreover, the fact witnesses do not state that Kellogg was to design or redesign a "pressure relief system" for the K–Resin Unit. Therefore, what Howell believes this language means to a pressure-relief design engineer is not relevant to determining the scope of work to which Kellogg and Phillips agreed. [11]

Kellogg asserts that, as a matter of law, its scope of work was limited to evaluating the size of the Safety Valve. This assertion lacks merit. However, the Workers assert that the scope of work included, among other things, the following: (1) designing or redesigning the pressure relief valve and overpressurization-detection system for the East Tank and the West Tank; (2) recommending any additional engineering controls that should be added; and (3)

ensuring that the pressure relief system could control the worst-case scenario.

After considering Kellogg's summary-judgment grounds attacking duty and the summary-judgment evidence under the applicable standards of review, we conclude there is no genuine issue of material fact and that, as a matter of law, Kellogg owes no negligence duty as to the preceding three matters and as to items 4, 6, 7, 9, 10, 11, 12, 14, and 18 in the Workers' list of eighteen acts of alleged negligence. *See ante* at pp. 721–22; *Entex, A Div. Of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 10–11 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (concluding that, as a matter of law, there could not possibly be a negligence duty based on a contractual duty if, as a matter of law, there was no contractual duty).

**C. Did the trial court err in granting summary judgment because the summary-judgment evidence raises a genuine fact issue as to whether Kellogg's negligence was a proximate cause of the Workers' injuries?**

In their third sub-issue, the Workers assert the trial court erred in impliedly granting summary judgment based on the traditional and no-evidence grounds attacking proximate cause. Proximate cause consists not only of foreseeability, but also cause in fact. *Union*

---

**10.** The Workers also cite testimony from Project Manager Clint Wood that "[a]ny design or evaluation of a pressure relief system requires you to consider the potential for a runaway reaction." However, Wood did not testify that Kellogg's scope of work was either to design or evaluate any pressure relief system. In any event, if Kellogg had to consider all relieving conditions, then one relieving condition considered would be overpressurization due to a runaway reaction. The Workers also cite testimony from a Kellogg engineer that Kellogg was aware that a runaway reaction was a possible hazard associated with butadiene; however, that testimony goes to Kellogg's awareness rather than its contractual scope of work.

**11.** In addition, Howell's statements regarding the content of various deposition transcripts are conclusory and do not raise a fact issue. *See Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (stating that even unobjected-to conclusory testimony does not raise a fact issue).

*Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995). Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury which would otherwise not have occurred. *Id.*

 When an event intervenes between the alleged negligent act and the injury, a question may arise whether this event constitutes a superseding cause that breaks the causal connection between the act and the injury. *Taylor v. Carley*, 158 S.W.3d 1, 9 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). Texas courts distinguish between a new and independent cause and a concurrent act. A concurrent act cooperates with the original act in bringing about the injury and does not cut off the liability of the original actor. *Id.* A new and independent cause, sometimes referred to as a superseding cause, however, is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury. *Id.* The issue of new and independent cause is a component of the ultimate issue of proximate cause and not an affirmative defense. *Taylor*, 158 S.W.3d at 9.

 The Workers and their expert (Peter Howell) contend that Kellogg, in carrying out its duties under the 1995 contract with Phillips, should have evaluated all possible overpressure scenarios, determined that a fire-induced runaway reaction was the worst-case scenario, and recommended to Phillips that it do the following:

- replace the Safety Valve on the East Tank with a new and larger pressure safety valve sized according to this worst-case scenario;
- replace the rupture disk with one that was designed for use in polymerizing service;
- install a temperature monitor with a high-temperature alarm that would notify the K–Resin operator in the control room that the temperature in the East Tank was higher than the maximum determined safe value;
- install a pressure monitor with a high-pressure alarm to warn that the pressure was greater than the maximum determined safe value;
- install a quench system which, when automatically activated by high pressure or temperature would inject an inert solvent into the tank that would cool and slow the runaway reaction;
- install an oxygen analyzer that would sound an alarm if oxygen concentration in the tank reached an unsafe level;
- add a pressure-control system to the tank that would automatically vent vapors if the pressure exceeded a predetermined safe value, that would continuously purge oxygen from the tank, and that would also have a high-pressure alarm; and
- add chemical seals to significantly enhance the reliability of intricate and vulnerable instruments and to protect them better from the process chemicals.

The Workers assert Kellogg failed to comply with both its contractual duty to Phillips in rendering the Services in 1995 and 1996 and in complying with the negligence duty that it assumed to third parties by agreeing to perform these services. The Workers assert Kellogg breached this negligence duty by failing to do all of the above. However, for this alleged negligence in 1995 and 1996 to have caused the Workers' injuries in 2000, the Workers must show the following:

(1) Phillips would have implemented the above recommendations and installed the recommended new items prior to the incident on March 27, 2000.

(2) The recommended new items would not have been deactivated by Phillips and would have triggered Phillips to act differently than it did.

(3) The recommended items would have prevented the catastrophic failure of the East Tank.

The summary-judgment evidence proves that Phillips was aware of the pressure in the East Tank prior to its rupture. Howell stated that the pressure alarm would be set at 75 psi, yet Phillips employees were aware that the pressure was 70–75 psi in the East Tank in the week before the explosion, and this did not trigger any prompt action on their part to address the situation. The East Tank contained unchilled, dry butadiene when there was no nitrogen purge or activated pressure safety valve and when popping sounds associated with popcorn polymerization were heard emanating from the East Tank. Despite all of these alarming signs that prompt remedial action was needed, Phillips did not respond timely or appropriately. Adding the monitors and alarms that Howell believes should have been recommended would only have provided Phillips with the same information it already had.[12]

The Workers also assert, and Howell testified, that one of Kellogg's duties was to take into consideration that Phillips employees might respond improperly and to recommend the installation of devices that would operate automatically without human intervention, thus taking into account human error. For example, the Workers argue that the closing of the Block Valve on March 4 is "of course, the precise kind of worst case scenario that [Kellogg] was hired to consider and prevent by, among other things, designing and recommending redundant safety systems and human error proof systems." However, in making this argument the Workers overlook the fact that, if not disabled, the Safety Valve for the East Tank functioned automatically, without the need for human intervention, when the tank pressure reached 85 psi. None of the systems Howell recommended are incapable of being disabled by Phillips employees. Therefore, even if some of the systems he described were automatic, they would not eliminate the potential for human error because, just as Phillips's employees disabled the Safety Valve, they could have disabled or deactivated the described systems. It is evident from the circumstances surrounding the explosion that Phillips would have deactivated whatever pressure-relief devices were present for the East Tank, including Howell's quench system. Therefore, the Workers' arguments regarding allegedly foolproof, automatic systems are not persuasive.

The Workers, with supporting testimony from Howell, also assert that Kellogg should have based its recommendations in part on Phillips's allegedly well-known reputation for poor safety practices in its facilities. Again, because the Phillips employees control and interact with all of the devices in question and have the ability to ignore, disable, or misuse these devices, if anything, this argument weighs in favor of Phillips's conduct being a new and independent cause.

Regarding the dangerous situation in the East Tank and Phillips's awareness thereof, Bryan Hall, an operations supervisor at Phillips testified as follows:

- If one knows that liquid butadiene was in the East Tank, it would be inappropriate and against procedures to close the Block Valve.

- Closing the Block Valve while the East Tank contained butadiene would create an incredibly dangerous situation.

12. Furthermore, the evidence reflects that Phillips had a problem in the past with having so many alarms that the operators did not take the alarms seriously.

- K–Resin operators should never disable the Safety Valve if the East Tank contains chemicals of any type; rather, they should do so only after they have cleared and purged the tank and it is ready for entry.

- It would be a dangerous situation if a storage tank (1) contained liquid, dry, unchilled butadiene for five weeks with audible popping sounds coming from inside the tank, (2) had a pressure safety valve that had been disabled, and (3) had a pressure of 75psi and no nitrogen purge.

- Based on his training and fourteen years of experience in the K–Resin Unit, it would be dangerous to leave dry butadiene in a piece of equipment without chilling or a nitrogen purge for more than one day.

- Phillips operators were educated and aware of the dangers of a runaway reaction if there is butadiene in a piece of equipment without a continuous nitrogen purge.

Despite knowing the dangers of unchilled, dry butadiene, on March 4, Phillips both disabled the Safety Valve and opened an isolation valve that resulted in dry butadiene flowing back into the East Tank. Regardless of which event happened first, at the end of that day, Phillips knew the East Tank contained substantial quantities of dry butadiene and that the Safety Valve had been disabled. Despite attempts to remove the butadiene in the following days, the external appearance of the East Tank continued to show the presence of butadiene. Furthermore, a maintenance supervisor observed that the Safety Valve was still disabled on March 14. On March 16, a K–Resin operator noted a pressure reading that showed Phillips had lost the nitrogen purge on the East Tank. On March 20, an operator heard popping sounds coming from inside the East Tank, indicating the presence of butadiene that was undergoing popcorn polymerization. By this time, more than a month had passed since popping sounds were first heard coming from the East Tank. Sixteen days had passed since Phillips had disabled the Safety Valve, knowing that there was dry, unchilled butadiene in the East Tank, and four days had passed since Phillips lost the nitrogen purge. Nonetheless, Phillips took no prompt action to address this very dangerous situation in the East Tank or to open the Block Valve. On March 25 or 26, an operator verified that the Block Valve was closed, yet Phillips took no action to open it before the catastrophic failure of the East Tank on March 27. In its subsequent investigation into this incident, Phillips's investigation team concluded that "the vessel relief system was designed and sized per Phillips standards. It is the opinion of this team that if the [Safety Valve] had relieved at its design conditions, the resulting evaporative cooling and pressure reduction would have prevented the vessel failure." [13]

In his deposition, Howell testified that Phillips knew it should not leave butadiene

13. The Phillips team identified the following "causal factors": (1) disabling of the Safety Valve, (2) Phillips's failure to fully take into account the increased likelihood of popcorn polymerization after 1997, when the alumina dryers were added to the K–Resin process, (3) Phillips's allowing uninhibited butadiene to remain too long in the East Tank at ambient temperatures and without cooling, purging, or pressure relief, and (4) Phillips's failure to take prompt action after the loss of the nitrogen purge on the East Tank on March 16. The team dismissed all the following as playing a role in the incident: (1) inadequately sized pressure safety valve, (2) incorrectly installed rupture disk, (3) incorrectly set pressure safety valve, (4) wrong pressure safety valve installed, and (5) relief lines plugged with polymer.

in idle equipment at ambient temperature for more than one day, yet Phillips left dry butadiene in the East Tank at ambient temperature for 39 days, which he believed shows willful disregard by Phillips for the safety of its employees. Howell also testified that Phillips violated the law when it closed the Block Valve, thereby disabling the Safety Valve.

■ In determining whether an intervening force rises to the level of a superseding cause, Texas courts consider the following six factors:

(1) the fact the intervening force brings about harm different in kind from that which otherwise would have resulted from the actor's negligence;

(2) the fact the intervening force's operation or its consequences appear after the event to be extraordinary, rather than normal, in view of the circumstances existing at the time of the force's operation;

(3) the fact the intervening force is operating independently of any situation created by the actor's negligence or is not a normal result of such a situation;

(4) the fact the operation of the intervening force is due to a third person's act or to his failure to act;

(5) the fact the intervening force is due to an act of a third person that is wrongful toward the other and thus subjects the third person to liability to him; and

(6) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*See Phan Son Van v. Pena,* 990 S.W.2d 751, 754 (Tex.1999). Under the applicable standard of review, the evidence proves that Phillips's conduct (1) was extraordinary rather than normal in light of the circumstances existing at the time, (2) operated independently of any situation created by Kellogg's alleged negligence in 1995 and 1996, (3) is due to a third party's act or failure to act, and (4) involves highly culpable wrongful acts of a third person. The summary-judgment evidence proves as a matter of law that there is no genuine issue of material fact and that Kellogg is entitled to summary judgment because Phillips's actions leading up to the explosion and fire were a new and independent cause, as opposed to a concurrent act, so that the element of proximate cause fails.[14] *See Taylor,* 158 S.W.3d at 8–11 (affirming summary judgment based on the acts of other parties being a new and independent cause as a matter of law, such that causation was lacking); *Coleman v. Equitable Real Estate Invest. Manag., Inc.,* 971 S.W.2d 611, 616–18 (Tex.App.-Dallas 1998, no pet.) (concluding that summary judgment was proper as to element of proximate cause because, even if defendant had duty to provide reasonable security, employee's opening of locked door after store had closed to allow man inside was a new and independent cause as to negligence claim for damages after the man murdered that employee and one other); *Aerospatiale Helicopter Corp. v. Universal Health Services, Inc.,* 778 S.W.2d 492, 496–97 (Tex.App.-Dallas 1989, writ denied) (holding that even if company's part was defective and caused one of the two engines in

14. The Workers cite *Bottoms v. Smith* regarding the proximate-cause issue. *See* 923 S.W.2d 247, 250–51 (Tex.App.-Houston [14th Dist.] 1996, no writ). The *Bottoms* case did not involve any issue of new and independent cause. *See id.* While the *Bottoms* court did conclude there was a fact issue as to whether a doctor's alleged negligence in failing to perform a diagnostic test proximately caused decedent's death from cancer, the nature of the claims and the summary-judgment evidence in *Bottoms* differ significantly from those in this case. *See id.* Therefore, the *Bottoms* case does not require a reversal in this case.

the helicopter to fail, there was no causation as a matter of law because pilot of helicopter broke causal chain when he, in violation of proper procedures, cut the fuel line to the remaining engine that was operating sufficiently at the time).

Furthermore, at some point in the causal chain, a defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation. *See Union Pump,* 898 S.W.2d at 775. The law does not hold people legally responsible for the remote results of their wrongful acts and therefore draws a line between immediate and remote causes. *Id.* To be a legal cause of another's harm, the negligence also must be a substantial factor in bringing about the plaintiff's harm. *Id.* at 776. The word "substantial" is used to denote the fact that the defendant's conduct had such an effect in producing the harm as to lead reasonable people to regard it as a cause, using that word in the popular sense, which includes the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. *Id.* In other words, the conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm. *Union Pump,* 898 S.W.2d at 776. Often the causal link between conduct and injury will be too remote to be legally significant when two separate and sequential incidents that are allegedly tortious join to lead to the injury. *See IHS Cedars Treatment Center of De-Soto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 800 (Tex.2004). Under the applicable standard of review, the causal link between Kellogg's work in 1995 and 1996 and the explosion and fire on March 27, 2000, is too remote, and, as a matter of law, any act or omission by Kellogg was not a substantial factor in bringing about the Workers' injuries. *See Ambrosio v. Carter's Shooting Center,* 20 S.W.3d 262, 266–69 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (affirming summary judgment and concluding there was no causation as a matter of law because any negligence by the store in storing and displaying firearms was too remote from decedent's murder using a gun stolen from the store); *Roberts v. Healey,* 991 S.W.2d 873, 877–80 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (affirming summary judgment and holding that any negligence by divorce attorney in failing to obtain protective order against his client's estranged husband was too remote from the husband's murder of couple's two children for lawyer's negligence to' be legal cause of mother's damages). Therefore, to the extent the Workers' allegations of negligence survive Kellogg's no-duty challenges, the trial court did not err in granting summary judgment as to the Workers' negligence allegations because summary judgment was proper as to proximate cause. Accordingly, we overrule the Workers' remaining issues.

The trial court's judgment is affirmed.

EDELMAN, J., concurs without opinion.