Affirmed and Opinion filed March 27, 2007








Affirmed and Opinion filed March 27, 2007.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-04-01022-CV

_______________

 








ABEL ARGUELLESS, LAURA ARGUELLES, TERRIE A. AUGUSTINO,
PETRA RENEE BARFIELD, WILLIAM A. BARFIELD, ADOLPH BROWN, DESMOND BURNETT, DORA
A. BURNETT, RICKY A. CARTER, CARL RAY CRANE, DENNIS M. CURRY, STEPHANIE L.
CURRY, PAUL KEVIN CUTRER, SONDRA DORFLINGER CUTRER, CHRISTY DURDEN, RANDAL
WILLIAM DURDEN, ARTHUR ESCOBEDO, JANIE ESCOBEDO, DEREK TODD EVETT, KIMBERLY
EVETT, KAREN GEORGE, ROCKY D. GEORGE, LINO A. GONZALEZ, MARIE S. GAYNOR
GONZALEZ, BERTHA GUIDRY, LAMBERT GUIDRY, LARRY C. HAMMANS, MIRANDA HAMMANS,
MAURICE F. HODGE, JOHN B. JACKSON, JIMMY RAY JONES, VICKY RENEE JONES, DIANA
KELLY, JERRY W. KELLY, DIANA KELLY, JERRY W. KELLY, GEORGE P. LA FEAR, SHERRY
ELIZABETH LA FEAR, DAN Q. LAM, AMY MARIE LAM, HILDA M. LEWIS, ANNA LAURA MARTINEZ,
BALDEMAR GONZALEZ MARTINEZ, ANGELA L. MERCIER, TERRY MARTIN MERCIER, EDNA ANN
NORMAN, MICHAEL J. NORMAN, CHERYL J. REEDY, MICHAEL REEDY, BETTY SAENZ,
GILBERTO M. SAENZ, JAMES AARON SHANKLE, MARCHELLE D. WATKINS, ANGELA KAY
WILLIAMS, BRENDA CASTLE WILLIAMS, DARRELL E. WILLIAMS, JESSIE MAE WILLIAMS,
LONZY WILLIAMS, MARY ANN WILLIAMS, REGINALD CALVIN WILLIAMS, TIMOTHY OWEN
WILLIAMS, PACIFIC EMPLOYERS INSURANCE COMPANY, ADARIENNE BRADLEY, JACK W.
CHRISTY, MICHAEL EDWARD COLE, RODOLFO COMA, DOUGLAS COUNTS, WILLIAM DE LA
VERGEN, JACKIE EDWARDS, RICHARD E. FRIDAY, NICK GARCIA, IGNACIO GARZA, BRIAN
GIBSON, FIDENCIO GONZALEZ, JOSEPH E. GONZALEZ, ROY GUERRA, DAVID HERNANDEZ,
DEREK W. HOLMES, BARRY HOLCOMB, MARILYN G. JONES, GERALD LOHSE, EARL MCPHERSON,
DANNY MEADOWS, JR., MICHAEL MORALES, FORREST E. PROBST, LEON RITTER JAN ALLEN
STEWART, KENNETH VANCE, ANGELA ANN VAYDIK, DAVID YEARY, AND TONY LATAYNE GOTT,
INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF RODNEY GOTT, Appellants

 

V.

 

KELLOGG BROWN & ROOT, INC., INDIVIDUALLY AND AS
SUCCESSOR IN INTEREST TO THE M. W. KELLOGG COMPANY, AND HALLIBURTON COMPANY,
INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO THE M. W. KELLOGG COMPANY,
Appellees

                                                                        
                                                                       

On Appeal from the 334th District Court

 Harris County, Texas

Trial Court Cause No. 02-14984-A

                                                                                                                                               


 

  O P I N I O N








This case arises from a terrible
explosion and fire at a large chemical complex, resulting in personal injury to
many workers.  After some of the injured workers filed negligence claims
against companies that allegedly had provided services to their employer, the
trial court rendered a summary judgment that the workers take nothing on their
claims against the service providers.  On appeal, the workers assert that the
judgment in favor of the service providers lacks finality and that the trial
court erred in granting summary judgment because (1) there is substantial
evidence the service providers owed the workers a duty of care, (2) there is
substantial evidence the service providers= alleged negligence was a proximate
cause of the workers= injuries, (3) there is substantial evidence the employer=s actions leading up to the explosion
were not a new and independent cause of the explosion, and (4) there are fact
issues on all matters raised by the service providers.  We conclude the
judgment is final.  We also conclude that, as a matter of law under the
applicable standard of review, any breach of the duties owed by the service
providers did not proximately cause the workers= injuries.  Accordingly, we affirm
the trial court=s judgment.  

                                                  I.  Factual Background[1]

Phillips Petroleum Company initiated
operation of the K-Resin Unit in Phillips Petroleum Company=s Houston Chemical Complex
(hereinafter AK- Resin Unit@) in 1978 to produce a styrene-butadiene block copolymer
called AK-Resin.@  K-Resin is a clear, flexible
plastic that has many uses in the food and medical packaging industries. 
Understanding the K-Resin manufacturing process and the operation of the
K-Resin Unit is essential to the proper resolution of the issues in this
appeal.  

A.        The K-Resin Process               


One of the raw materials used in the
reactors at the K-Resin Unit is a diene monomer called 1,3-butadiene
(hereinafter Abutadiene@).  Because it is a monomer, butadiene will polymerize or
react with itself.  The butadiene arrives at the K-Resin Unit by a dedicated
pipeline and is stored in a 200,000-gallon spherical tank.  As it arrives
through the pipeline and is stored in this tank, the butadiene contains an
inhibitor called ATBC@ that inhibits butadiene from reacting with itself to form
polymers.[2]  Butadiene
that contains such an inhibitior is called inhibited or wet butadiene, and
butadiene that lacks any such inhibitor is called uninhibited or dry
butadiene.  The wet butadiene in the spherical tank recirculates continuously
through a refrigerated chiller to maintain a temperature of approximately 45
degrees Fahrenheit.  The presence of the inhibitor in the butadiene and the low
temperature prevent the butadiene from reacting with itself to form polymers
while it is stored in the spherical tank.








To create the desired product, steps
are taken to ensure the butadiene is free of inhibitor before it is fed to the
reactors.  The wet butadiene is moved from the spherical tank to activated
alumina molecular sieves or dryers, which remove impurities, including
inhibitor, from the butadiene.  Because the dry butadiene is normally fed to
the reactors intermittently and because there are usually several reactors in
operation, the dry butadiene is distributed to either the East or the West Dry
Butadiene Tank to ensure that there is adequate dry butadiene to feed to the
reactors.  

At the time of the explosion, each of
the Dry Butadiene Tanks was eight feet in diameter and approximately forty feet
tall.  Each tank had a capacity of 13,000 gallons.  Only one Dry Butadiene Tank
was used at a time.  When a tank was not in service, Phillips employees would
empty it, remove a form of butadiene polymer known as Apopcorn polymer@ from inside, and then place the tank
on stand-by to go into service in place of the other tank.  The dry butadiene
in the tank that is in service circulates continuously through a charge filter
and then a chiller.  The filter removes rust, polymers, and any other
particulates that may be in the dry butadiene. The cooler keeps the butadiene
cool while the substance is awaiting transfer to the reactors.  This low
temperature is necessary to prevent the butadiene from reacting with itself to
form polymers while it is being stored in the Dry Butadiene Tanks.  While
butadiene has a tendency to react with itself to form various polymers, at low
temperatures the rates of these reactions are very slow.  However, as the
temperature increases, the reaction rates increase rapidly.  

The Dry Butadiene Tank being used to
feed the reactors is isolated from the other tank as the dry butadiene is
pumped to the reactor as and where needed.  The Butadiene Charge Pump moves the
dry butadiene through a charge filter to a reactor.  In the reactor, the dry
butadiene is combined with styrene to produce K-Resin.

                            The
Danger of Popcorn Polymerization in Dry Butadiene








APopcorn polymer@ is a butadiene polymer in which
there is considerable cross-linking within the polymer.  This cross-linking
causes the popcorn polymer to be hard and also insoluble in the butadiene. 
Popcorn polymer grows when the molecular bonds in its cross-linked structure
break to form an active site where butadiene can react, attach, and become part
of the popcorn.  This growing process causes a popping sound, which is the
origin of the name Apopcorn polymer.@  As the popcorn polymer grows,
stresses are formed within the popcorn that cause additional bonds to break and
form more active sites, which can cause further growth of the popcorn polymer. 
The formation of popcorn polymer is only a problem in the part of the K-Resin
process that occurs after the butadiene passes through the dryers.  Before this
point in the process, the butadiene contains inhibitor, which prevents popcorn
growth.  But after the butadiene passes through the dryers into the Dry
Butadiene Tanks, the butadiene has no inhibitor, and popcorn polymer can form. 
Butadiene=s ability to react with itself to form popcorn polymer affects
temperature, and, more importantly, pressure.  








At any given time, a Dry Butadiene
Tank containing butadiene contains a combination of liquid and vapor butadiene
in the tank.  APopcorn seeds@ form when small amounts of oxygen are allowed into the
tank.  The reaction that creates a popcorn seed liberates heat.  Once the
popcorn seed forms, it is then free to react with the dry, liquid butadiene
that surrounds it.  By reacting with the surrounding liquid butadiene, the
popcorn seed can grow.  Each reaction in which the popcorn seed grows liberates
heat.  Consequently, the continuing popcorn polymer growth generates heat that
increases the temperature inside the tank.  Temperature increases, in turn,
cause the pressure inside the tank to increase.  The rate of growth of popcorn
polymerization accelerates as the temperature and pressure increase inside the
tank.  Because the growth of popcorn polymerization increases temperature and
pressure, this process feeds on itself.  Once the temperature and pressure
inside the tank reach high enough levels, the reaction rate continues to
accelerate until it eventually accelerates very rapidly.  This rapid
acceleration, in turn, causes the pressure to increase dramatically in a very
short period of time.  This rapid increase in pressure can rupture the vessel
in which the butadiene self-reactions are occurring.[3]

                             The
Pressure Safety Valves on the Dry Butadiene Tanks

Because of the danger of
overpressurization, the East Dry Butadiene Tank (AEast Tank@) had a pressure safety valve (ASafety Valve@), a safety device located near the
top of the tank that was designed to protect the tank from failing due to
overpressure.  Once the pressure inside the East Tank reached a certain level C 85 psi C the Safety Valve automatically would
lift to relieve pressure from inside the tank.  Automatic activation of the
Safety Valve would allow the butadiene vapor to flow out of the tank and move
on to the flare, a process that would dispose of the butadiene safely.  The
Safety Valve, however, could be disabled.  Located downstream of the Safety
Valve was a block valve (ABlock Valve@).  Closing the Block Valve disabled the Safety Valve. 
Although the Safety Valve might lift when the pressure inside the tank reached
85 psi, the Block Valve would not allow the pressure to exit the tank. 
Consequently, if the Safety Valve were disabled, pressure could continue to
increase inside the tank until the tank ruptured.

B.        The
Explosion and Fire








To analyze the issues in this case,
we must consider the events that occurred in the weeks preceding the explosion
and fire in the Phillips complex on March 27, 2000.  In mid-February 2000, the
East Tank was in use; however, K-Resin unit personnel heard the popping sounds
associated with the growth of popcorn polymer coming from inside the East
Tank.  In response, Phillips decided to take the East Tank out of service so
that it could be emptied and cleaned of popcorn polymer.  Accordingly, on
February 19, Phillips took the East Tank off-line and put the West Dry
Butadiene Tank (AWest Tank@) in service.  Phillips operators isolated the East Tank from
the process by closing various isolation valves.  They then connected a
nitrogen hose to the upper portion of the tank, connected a drain hose to the
bottom of the tank, and pressured the liquid from the tank to a flare to be
burnt off.  This nitrogen purge was intended to remove the remaining liquid and
vapor butadiene from the East Tank.  

On March 4, the nitrogen purge was
relocated to the bottom of the East Tank.  Although Phillips was trying to
isolate the East Tank, the operator did not realize that the isolation valve
that normally would be used to isolate the East Tank from the West Tank had
been severely leaking and that operators had been relying on an emergency
isolation valve to separate the two tanks.  Because the operator relied on the
severely leaking valve and opened the emergency isolation valve, thousands of
gallons of dry butadiene flowed from the West Tank back into the East Tank and
the levels of the two tanks equalized at approximately 32%.  The emergency
isolation valve was then closed and the butadiene level in the East Tank was
lowered to approximately 27%.  Also on March 4, in response to an isolation
list issued by a Phillips employee, Phillips closed the Block Valve located
downstream of the Safety Valve, thus disabling the Safety Valve. 








From March 3 to March 6, the lower
part of the East Tank was seen to be Aiced over,@ indicating the presence of liquid,
dry butadiene in the East Tank.  On March 6, another K-Resin operator opened
the emergency isolation valve between the East Tank and the West Tank, so that
the levels in the two tanks again equalized.  The K-Resin operators made various
attempts to drain and clear the East Tank of butadiene.  On March 14, while
conducting a relief device audit, a Phillips maintenance supervisor observed
that the Block Valve was still locked in the closed position, meaning that the
Safety Valve was disabled.  On March 16, a K-Resin operator observed a sweat
line on the East Tank, indicating that it still contained liquid butadiene. 
The same day, a K-Resin operator observed a reading of 70-75 psi on a pressure
gauge on the East Tank, indicating the operators had lost the nitrogen purge on
the East Tank.  On March 20, an operator heard popping sounds coming from
inside the East Tank.  On either March 25 or 26, an operator verified that the
Block Valve was closed.[4] 
Additionally, on March 26, an operator observed a reading of between 70 and 75
psi on a pressure gauge for the East Tank, indicating that Phillips still had
not established a nitrogen purge on the East Tank.  

On March 27, the pressure inside the
East Tank increased rapidly and there was a rupture and catastrophic failure of
the East Tank at 1:22 p.m. This rupture released flammable butadiene and caused
other tanks in the immediate area to rupture, releasing additional flammable
material.  This release of flammable material caused a fire that killed one
person and severely injured several others.  Other Phillips employees received
lesser injuries.  In a report Phillips issued following its investigation into
this casualty, Phillips described this catastrophic failure on March 27 as
follows: 

Vessel overpressure due to
polymerization and dimerization within isolated vessel & no relief or
cooling . . . [East Tank] contained uninhibited [butadiene] for too long a
period at ambient temperatures without cooling or adequate relief.  Popcorn
polymer was present.

After this deadly occurrence, the
Block Valve was recovered and was found to be in the closed position.

                                             II.  Procedural Background








Various Phillips employees injured in
the explosion and fire as well as various family members of some of these
employees filed this suit asserting negligence claims against
defendants/appellees Kellogg Brown & Root, Inc., Individually and as
Successor in Interest to the M. W. Kellogg Company, and Halliburton Company,
Individually and as Successor in Interest to the M. W. Kellogg Company
(hereinafter collectively referred to as AKellogg@).  Other Phillips employees
intervened asserting negligence claims, and Phillips=s workers= compensation insurance carrier
intervened asserting a subrogation claim.  Any differences among the claims of
these plaintiffs and intervenors are not material to the disposition of this
appeal, and, for simplicity, all of the plaintiffs/appellants and
intervernors/appellants are collectively referred to herein as the AWorkers.@  

A.        The
Workers= Negligence Claims

The Workers grounded their negligence
claims against Kellogg on services Kellogg had provided to Phillips in 1995 and
1996, several years before the explosion.  The Workers allege that Phillips
hired Kellogg Ato evaluate the pressure relief system and to consider and recommend all
possible relieving scenarios for the K-Resin Unit.@  The Workers allege that knowing Athe potential for and risks of popcorn
polymer with dry butadiene, [Kellogg] failed to consider all credible
overpressurization scenarios when evaluating the [dry butadiene storage tanks]
at issue in this case.@  The Workers assert that the result of Kellogg=s negligence Awas an inadequate pressure relief and
overpressurization detection system and the explosion and fire that severely
injured [the  Workers].@  Based on these services, the Workers allege negligence
against Kellogg, asserting the following in their live petition:

[Kellogg] proximately caused the incident complained
of herein and the severe injuries to [the Workers] through the enumerated
negligent acts or omissions:

1.         Failure to consider all credible
overpressurization scenarios for pressure relief system [sic] on the Dry
[butadiene] storage tanks;

2.         Failure to consider any scenario other than
external fire or liquid overfill;

3.         Failure to properly perform the
overpressurization scenarios for  external time [sic] and liquid overfill;

4.         Failure to properly design the pressure
relief valve and overpressurization detection system for the Dry [butadiene]
storage tanks;

5.         Failure to warn Phillips of the
inadequacies of the pressure relief valve rupture disk and overpressurization
detection system for the Dry [butadiene] storage tanks;

6.         Failure to advise Phillips of engineering
controls required to be implemented on reactive systems;

7.         Failure to consider and recommend
engineering solutions to prevent overpressurization;








8.         Failure to identify the overpressurization
risks of a highly reactive Butadiene system;

9.         Failure to provide qualified engineers to
complete the Design Project;

10.       Failure to provide trained engineers to
complete the Design Study;

11.       Failure to train its engineers on the
reactivity and hazards of Butadiene;

12.       Failure to train and educate its engineers
on the pressure relief design methods for reactive systems;

13.       Failure to identify the proper maximum
allowable working pressure on the dry butadiene storage tanks;

14.       Failure to train and educate its engineers
on engineering standards and codes applicable to preparing pressure relief
designs for reactive systems;

15.       Failure to consider and recommend
alternative engineering safeguards in the event the pressure safety valve
failed;

16.       Failure to recognize and specify the proper
rupture disk for the dry [butadiene] storage tanks;

17.       Failure to advise Phillips to remove a
rupture disk not specified for polymerization service; and

18.       Failure
to consider and recommend automatic engineering controls to prevent
overpressurization and runaway reactions.

B.        The
Summary Judgment Motions and Ruling

Kellogg filed motions for summary
judgment,[5] asserting the
following grounds:

                                          Traditional
Summary-Judgment Grounds

(1)       As a matter of law, Kellogg=s contractual duty was limited to evaluating the size
of the Safety Valve.

(2)       If Kellogg=s duty was so limited, then any alleged breach, as a matter of law,
could not have proximately caused the Workers= injuries because, as a matter of law, the Safety Valve was disabled at
the time of the incident.








(3)       If,
as the Workers contend, Kellogg=s alleged duty extended to recommending additional
engineering controls, any alleged breach of that duty, as a matter of law,
could not have proximately caused the Workers= injuries because (a) it is
impossible for the Workers to prove that Phillips would have adopted a
recommendation that would have prevented this incident; (b) the evidence
conclusively disproves the requisite element of causation; and (c) Phillips=s own conduct was a new and
independent cause.

                                         No-Evidence
Summary Judgment Grounds

(1)       There is no evidence Kellogg had any
relevant duty other than to size the Safety Valve.

(2)       There is no evidence any failure to properly
size the Safety Valve caused the incident.

(3)       There is no evidence that the disabling of
the Safety Valve was foreseeable to Kellogg.

(4)       There is no evidence Kellogg had any duty to
recommend engineering controls to Phillips.

(5)       Even
if Kellogg=s duty extended to recommending additional engineering controls, there is
no evidence Phillips would have implemented any control that would have
prevented this incident, nor is there any evidence of the requisite causal link
between Kellogg=s conduct and the incident.

The Workers responded to these
motions with voluminous summary-judgment evidence, including two very lengthy
experts= affidavits from Peter Howell and
Georges Melhem, both chemical engineers.  After striking substantial portions
of these two affidavits, the trial court granted a take-nothing summary
judgment against the Workers without specifying any ground.  The Workers
appeal.

 

                                                       III.  Issues Presented

 

On appeal, the Workers assert the
trial court erred in granting summary judgment.  They identify under this
single issue the following sub-issues:

(1)       Does the trial court=s judgment lack finality?

 

(2)       Did the trial court err in granting summary
judgment because there is substantial evidence Kellogg owed the Workers a duty
of care?

 








(3)       Did the trial court err in granting summary
judgment because there is substantial evidence Kellogg=s negligence was a proximate cause of the Workers= injuries?

 

(4)       Did the trial court err in granting summary
judgment because there is substantial evidence Phillips=s actions were not a new and independent cause of the
explosion? and 

 

(5)       Did
the trial court err in granting summary judgment because there are fact issues
on all matters raised by Kellogg?

                                                  IV.  Standards of Review

In reviewing a
traditional motion for summary judgment, we take as true all evidence favorable
to the nonmovant, and we make all reasonable inferences in the nonmovant=s favor.  Dolcefino
v. Randolph, 19 S.W.3d 906, 916 (Tex. App.CHouston [14th
Dist.] 2000, pet. denied).  If the movant=s motion and
summary-judgment evidence facially establish its right to judgment as a matter
of law, the burden shifts to the nonmovant to raise a genuine, material fact
issue sufficient to defeat summary judgment.  Id.

In reviewing a no-evidence motion for
summary judgment, we ascertain whether the nonmovant pointed out
summary-judgment evidence of probative force to raise a genuine issue of fact
as to the essential elements attacked in the no-evidence motion.  Id.;
Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 206B08 (Tex. 2002).  We take as true all
evidence favorable to the nonmovant, and we make all reasonable inferences
therefrom in the nonmovant=s favor.  Dolcefino, 19 S.W.3d at 916.  A no-evidence
motion for summary judgment must be granted if the party opposing the motion
does not respond with competent summary-judgment evidence that raises a genuine
issue of material fact.  Id. at 917.  When, as in this case, the order granting
summary judgment does not specify the grounds upon which the trial court
relied, we must affirm the summary judgment if any of the independent
summary-judgment grounds is meritorious.  FM Props. Operating Co. v. City of
Austin, 22 S.W.3d 868, 872 (Tex. 2000).  








                                                                 V. 
Analysis

A.        Does this court have appellate jurisdiction?    

In their first sub-issue, the Workers
challenge this court=s appellate jurisdiction by asserting the trial court=s judgment lacks finality because
Kellogg did not attack all of their theories for recovery under their
negligence claims.  The Workers note their allegations of eighteen different
acts of alleged negligence.  See ante at pp. 9-10.  The Workers then
argue that, in the motions for summary judgment, Kellogg challenged only seven
of these acts of negligence and did not challenge the other eleven acts of
negligence. Therefore, the Workers assert, the judgment lacks finality, citing Lehmann
v. Har-Con Corp., 39 S.W.3d 191 (Tex. 2001).  

A judgment issued without a
conventional trial is final only if it either actually disposes of all claims
and parties before the court, or it states with unmistakable clarity that it is
a final judgment.  See Lehmann v. Har-Con Corp., 39 S.W.3d 191, 192, 200
(Tex. 2001).  Kellogg did not assert a counterclaim against the Workers, and
the trial court rendered judgment that the Workers take nothing on their
claims, stating that it disposed of all claims asserted by the Workers. 
Although a second group of parties had intervened, asserting claims based on
the same explosion against different defendants, the trial court severed all
the Workers= claims against Kellogg into a separate case to make its summary judgment
final. The trial court both actually disposed of all claims and parties before
the court and stated with unmistakable clarity that its judgment is final. 
Therefore, the trial court rendered a final judgment, and this court has
appellate jurisdiction.  See id.; Ritzell v. Espeche, 87 S.W.3d
536, 538 (Tex. 2002) (holding that trial court=s judgment was final because it
stated that plaintiffs take nothing as to only claims pending in the case). 
Accordingly, we overrule the Workers= first sub-issue.[6]








B.        Did
the trial court err in granting summary judgment because there is substantial
evidence Kellogg owed the Workers a duty of care?

In their second sub-issue, the
Workers argue the trial court erred in granting summary judgment as to Kellogg=s grounds attacking duty because
there is substantial evidence supporting the negligence duties the Workers
allege Kellogg assumed under its contract to provide services to Phillips.  In
the relevant traditional summary-judgment ground, Kellogg essentially presumes
for the sake of argument that Kellogg otherwise would owe a negligence duty to
the Workers if it had a contractual obligation to Phillips; however, Kellogg
asserts that its contractual obligation to Phillips as a matter of law did not
go beyond evaluating the size of the Safety Valve and therefore any negligence
duty based thereon is also so limited.  The Workers assert the summary-judgment
evidence raised a genuine fact issue as to a much broader duty assumed by Kellogg
under its contract with Phillips.  

Phillips and Kellogg did not execute
a formal written contract for the services in question that Kellogg provided in
1995 and 1996 (hereinafter AServices@).  Kellogg asserts that one document defines the scope of
work and that the other is only an internal document that was never given to
Phillips.  Although there is summary-judgment evidence to support this
position, during discovery both scope-of-work documents were produced from
Kellogg=s files.  Under the applicable
standard of review, we conclude there is a genuine fact issue as to whether the
scope of Kellogg=s contractual duty includes the services as described in both
documents.  Under the first of these two documents, Kellogg=s scope of work is as follows:

!         to organize all existing calculation sheets
and specification sheets and compare them against a AK-Resin PSV Bypass Survey@ for completeness,








!         for ARelief
Devices@[7] with existing specification and calculation sheets,
(a) to tabulate the process conditions which had been utilized for Relief
Device sizing and (b) using verified process conditions, to correct any
discrepancies by updating the calculation and specification sheets and
Mechanical Flow Sheets accordingly,

!         for ARelief
Devices@ without existing specification and calculation
sheets, (a) to tabulate any relief devices which do not have calculation or
specification sheets and submit a request for process data for each of these
devices to the K-Resin process engineer, and (b) to then develop calculation
sheets and specification sheets based on the verified process  information,
with all equipment specifications to be verified against the field equipment,

!         for all ARelief
Devices,@ to make one copy of the final compilation for all
relief devices and to send the ARecord Copy@[8] to the Central Library,

!         to make sure that all documentation and relief device sizing
complies with Phillips Directives D-6-1 and D-6-2, which address, respectively,
(a) the requirements and guidelines for documentation of pressure relief
systems in new or modified facilities for processes covered by certain OSHA
regulations, and (b) certain codes that shall be complied with in the engineering,
design, procurement, and construction of pressure relief systems.

This document states that all
documentation and relief-device sizing must comply with two Phillips
directives.  Contrary to arguments made by the Workers, this statement does not
mean that Kellogg=s scope of work included everything in these two directives. 
Nonetheless, the first directive does state that, in creating documentation A[a]pplicable and credible relief
scenarios shall be investigated and documented.@  The directive continues: 

Documentation shall include the scenario used to size
each relief device as well as the scenarios used to size the relief headers and
flare or vent stacks.[9]  Items to be
included are:

1.  Affected equipment,








2.  Relief limiting instruments,

3.  Depressuring system (process control),

4.  Cause of overpressure (i.e., fire, process upset,
etc.)

5.  Calculated relief flow rates for each relief
device affected, and

6.  Calculations used to
develop scenarios and flows.

Under the second document (the one
Kellogg asserts was an internal memorandum), there is a genuine fact issue as
to whether Kellogg=s contractual duty also included the following tasks:

!         examine relief capacities and conditions for
each relief valve and include the different relief capacities and conditions on
the specification sheet,

!         check to see all relieving conditions are
considered and that the proper trim or disk was used where you have both liquid
and vapor relieving possibilities,

!         provide additions or corrections to
specifications and calculations,

!         recommend new pressure safety valve or
rupture disk specifications for problem valves

!         review progress and findings at regular intervals with K-Resin
Instrument Engineer.

In the trial court and on appeal, the
Workers point to deposition testimony from various Kellogg engineers who state
that Kellogg=s scope of work required it to Alook[] at allCall applicable causes@ or Ato check to see all relieving
conditions are considered.@  However, these statements add nothing to the statement in
the second document that Kellogg should A[c]heck to see all relieving
conditions are considered.@[10]








Howell, one of the Workers= experts, testified that, in his
opinion, various statements from the scope-of-work documents Atell a pressure relief design
engineer that they are to determine the overpressure scenarios, from them
determine the worst case scenario, and ensure that the pressure relief system
can control that worst case scenario.@  Even if this were correct, Howell
has no personal knowledge regarding Kellogg=s scope of work and the scope-of-work
documents.  Moreover, the fact witnesses do not state that Kellogg was to
design or redesign a Apressure relief system@ for the K-Resin Unit.  Therefore,
what Howell believes this language means to a pressure-relief design engineer
is not relevant to determining the scope of work to which Kellogg and Phillips
agreed.[11]  

Kellogg asserts that, as a matter of
law, its scope of work was limited to evaluating the size of the Safety Valve. 
This assertion lacks merit.  However, the Workers assert that the scope of work
included, among other things, the following: (1) designing or redesigning the
pressure relief valve and overpressurization-detection system for the East Tank
and the West Tank; (2) recommending any additional engineering controls that
should be added; and (3) ensuring that the pressure relief system could control
the worst-case scenario.  

After considering Kellogg=s summary-judgment grounds attacking
duty and the summary-judgment evidence under the applicable standards of review,
we conclude there is no genuine issue of material fact and that, as a matter of
law, Kellogg owes no negligence duty as to the preceding three matters and as
to items 4, 6, 7, 9, 10, 11, 12, 14, and 18 in the Workers= list of eighteen acts of alleged
negligence.  See ante at pp. 9B10; Entex, A Div. Of Noram Energy
Corp. v. Gonzalez, 94 S.W.3d 1, 10B11 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied) (concluding that, as a matter of law, there could not possibly be a
negligence duty based on a contractual duty if, as a matter of law, there was
no contractual duty).  








C.        Did
the trial court err in granting summary judgment because the summary-judgment
evidence raises a genuine fact issue as to whether Kellogg=s negligence was a proximate cause of
the Workers= injuries?

In their third sub-issue, the Workers
assert the trial court erred in impliedly granting summary judgment based on
the traditional and no-evidence grounds attacking proximate cause.  Proximate
cause consists not only of foreseeability, but also cause in fact. Union
Pump Co. v. Allbritton, 898 S.W.2d 773, 775 (Tex. 1995).  Cause in fact
means that the defendant=s act or omission was a substantial factor in bringing about
the injury which would  otherwise not have occurred.  Id.

When an event intervenes between the
alleged negligent act and the injury, a question may arise whether this event
constitutes a superseding cause that breaks the causal connection between the
act and the injury.  Taylor v. Carley, 158 S.W.3d 1, 9 (Tex. App.CHouston [14th Dist.] 2004, pet.
denied).  Texas courts distinguish between a new and independent cause and a
concurrent act.  A concurrent act cooperates with the original act in bringing
about the injury and does not cut off the liability of the original actor.  Id. 
A new and independent cause, sometimes referred to as a superseding cause,
however, is an act or omission of a separate and independent agency that
destroys the causal connection between the negligent act or omission of the
defendant and the injury complained of, and thereby becomes the immediate cause
of such injury.  Id.  The issue of new and independent cause is a
component of the ultimate issue of proximate cause and not an affirmative
defense.  Taylor, 158 S.W.3d at 9.  

The Workers and their expert (Peter
Howell) contend that Kellogg, in carrying out its duties under the 1995
contract with Phillips, should have evaluated all possible overpressure
scenarios, determined that a fire-induced runaway reaction was the worst-case
scenario, and recommended to Phillips that it do the following:

!         replace the Safety Valve on the East Tank
with a new and larger pressure safety valve sized according to this worst-case
scenario;

!         replace the rupture disk with one that was
designed for use in polymerizing service;








!         install a temperature monitor with a
high-temperature alarm that would notify the K-Resin operator in the control
room that the temperature in the East Tank was higher than the maximum
determined safe value;

!         install a pressure monitor with a high-pressure
alarm to warn that the pressure was greater than the maximum determined safe
value;

!         install a quench system which, when
automatically activated by high pressure or temperature would inject an inert
solvent into the tank that would cool and slow the runaway reaction;

!         install an oxygen analyzer that would sound
an alarm if oxygen concentration in the tank reached an unsafe level;

!         add a pressure-control system to the tank
that would automatically vent vapors if the pressure exceeded a predetermined
safe value, that would continuously purge oxygen from the tank, and that would
also have a high-pressure alarm; and

!         add chemical seals to significantly enhance the reliability of
intricate and vulnerable instruments and to protect them better from the
process chemicals.      

The Workers assert Kellogg failed to
comply with both its contractual duty to Phillips in rendering the Services in
1995 and 1996 and in complying with the negligence duty that it assumed to
third parties by agreeing to perform these services.  The Workers assert 
Kellogg breached this negligence duty by failing to do all of the above. 
However, for this alleged negligence in 1995 and 1996 to have caused the
Workers= injuries in 2000, the Workers must
show the following:

(1)       Phillips would have implemented the above
recommendations and installed the recommended new items prior to the incident
on March 27, 2000.

 

(2)       The recommended new items would not have
been deactivated by Phillips and would have triggered Phillips to act
differently than it did.

 

(3)       The
recommended items would have prevented the catastrophic failure of the East
Tank.








The summary-judgment evidence proves
that Phillips was aware of the pressure in the  East Tank prior to its
rupture.  Howell stated that the pressure alarm would be set at 75 psi, yet
Phillips employees were aware that the pressure was 70-75 psi in the East Tank
in the week before the explosion, and this did not trigger any prompt action on
their part to address the situation.  The East Tank contained unchilled, dry
butadiene when there was no nitrogen purge or activated pressure safety valve
and when popping sounds associated with popcorn polymerization were heard
emanating from the East Tank.  Despite all of these alarming signs that prompt
remedial action was needed, Phillips did not respond timely or appropriately. 
Adding the monitors and alarms that Howell believes should have been
recommended would only have  provided Phillips with the same information  it
already had.[12]

The Workers also assert, and Howell
testified, that one of Kellogg=s duties was to take into consideration that Phillips
employees might respond improperly and to recommend the installation of devices
that would operate automatically without human intervention, thus taking into
account human error.  For example, the Workers argue that the closing of the
Block Valve on March 4 is Aof course, the precise kind of worst case scenario that
[Kellogg] was hired to consider and prevent by, among other things, designing
and recommending redundant safety systems and human error proof systems.@  However, in making this argument
the Workers overlook the fact that, if not disabled, the Safety Valve for the
East Tank functioned automatically, without the need for human intervention,
when the tank pressure reached 85 psi.  None of the systems Howell recommended
are incapable of being disabled by Phillips employees.  Therefore, even if some
of the systems he described were automatic, they would not eliminate the
potential for human error because, just as Phillips=s employees disabled the Safety
Valve, they could have disabled or deactivated the described systems.  It is
evident from the circumstances surrounding the explosion that Phillips would
have deactivated whatever pressure-relief devices were present for the East
Tank, including Howell=s quench system.  Therefore, the Workers= arguments regarding allegedly
foolproof, automatic systems are not persuasive.








The Workers, with supporting
testimony from Howell, also assert that Kellogg should have based its
recommendations in part on Phillips=s allegedly well-known reputation for
poor safety practices in its facilities.  Again, because the Phillips employees
control and interact with all of the devices in question and have the ability
to ignore, disable, or misuse these devices, if anything, this argument weighs
in favor of Phillips=s conduct being a new and independent cause.  

Regarding the dangerous situation in
the East Tank and Phillips=s awareness thereof, Bryan Hall, an operations supervisor at
Phillips testified as follows:

!         If one knows that liquid butadiene was in the
East Tank, it would be inappropriate and against procedures to close the Block
Valve.

 

!         Closing the Block Valve while the East Tank
contained butadiene would create an incredibly dangerous situation.  

 

!         K-Resin operators should never disable the
Safety Valve if the East Tank contains chemicals of any type; rather, they
should do so only after they have cleared and purged the tank and it is ready
for entry. 

 

!         It would be a dangerous situation if a
storage tank (1) contained liquid, dry, unchilled butadiene for five weeks with
audible popping sounds coming from inside the tank, (2) had a pressure safety
valve that had been disabled, and (3) had a pressure of 75psi and no nitrogen
purge. 

 

!         Based on his training and fourteen years of
experience in the K-Resin Unit, it would be dangerous to leave dry butadiene in
a piece of equipment without chilling or a nitrogen purge for more than one
day.

 

!         Phillips operators were educated and aware of the dangers of a
runaway reaction if there is butadiene in a piece of equipment without a
continuous nitrogen purge. 








Despite knowing the dangers of
unchilled, dry butadiene, on March 4, Phillips both disabled the Safety Valve
and opened an isolation valve that resulted in dry butadiene flowing back into
the East Tank.  Regardless of which event happened first, at the end of that
day, Phillips knew the East Tank contained substantial quantities of dry
butadiene and that the Safety Valve had been disabled.  Despite attempts to
remove the butadiene in the following days, the external appearance of the East
Tank continued to show the presence of butadiene.  Furthermore, a maintenance
supervisor observed that the Safety Valve was still disabled on March 14.  On
March 16, a K-Resin operator noted a pressure reading that showed Phillips had
lost the nitrogen purge on the East Tank.  On March 20, an operator heard
popping sounds coming from inside the East Tank, indicating the presence of
butadiene that was undergoing popcorn polymerization.  By this time, more than
a month had passed since popping sounds were first heard coming from the East
Tank.  Sixteen days had passed since Phillips had disabled the Safety Valve,
knowing that there was dry, unchilled butadiene in the East Tank, and four days
had passed since Phillips lost the nitrogen purge.  Nonetheless, Phillips took
no prompt action to address this very dangerous situation in the East Tank or
to open the Block Valve.  On March 25 or 26, an operator verified that the
Block Valve was closed, yet Phillips took no action to open it before the
catastrophic failure of the East Tank on March 27.  In its subsequent
investigation into this incident, Phillips=s investigation team concluded that Athe vessel relief system was designed
and sized per Phillips standards.  It is the opinion of this team that if the
[Safety Valve] had relieved at its design conditions, the resulting evaporative
cooling and pressure reduction would have prevented the vessel failure.@[13] 








In his deposition, Howell testified
that Phillips knew it should not leave butadiene in idle equipment at ambient
temperature for more than one day, yet Phillips left dry butadiene in the East
Tank at ambient temperature for 39 days, which he believed shows willful
disregard by Phillips for the safety of its employees.  Howell also testified
that Phillips violated the law when it closed the Block Valve, thereby
disabling the Safety Valve. 

In determining whether an intervening
force rises to the level of a superseding cause, Texas courts consider the
following six factors:

(1)       the fact the intervening force brings about
harm different in kind from that which otherwise would have resulted from the
actor=s negligence;

(2)       the fact the intervening force=s operation or its consequences appear after the event
to be extraordinary, rather than normal, in view of the circumstances existing
at the time of the force=s operation;

(3)       the fact the intervening force is operating
independently of any situation created by the actor=s negligence or is not a normal result of such a
situation;

(4)       the fact the operation of the intervening
force is due to a third person=s act or to his
failure to act;

(5)       the fact the intervening force is due to an
act of a third person that is wrongful toward the other and thus subjects the third
person to liability to him; and

(6)       the
degree of culpability of a wrongful act of a third person which sets the
intervening force in motion.








See Phan Son Van v. Pena, 990 S.W.2d 751, 754 (Tex. 1999). 
Under the applicable standard of review, the evidence proves that Phillips=s conduct (1) was extraordinary
rather than normal in light of the circumstances existing at the time, (2)
operated independently of any situation created by Kellogg=s alleged negligence in 1995 and
1996, (3) is due to a third party=s act or failure to act, and (4)
involves highly culpable wrongful acts of a third person.            The
summary-judgment evidence proves as a matter of law that there is no genuine
issue of material fact and that Kellogg is entitled to summary judgment because
Phillips=s actions leading up to the explosion
and fire were a new and independent cause, as opposed to a concurrent act, so
that the element of proximate cause fails.[14] 
See Taylor, 158 S.W.3d at 8B11 (affirming summary judgment based the acts of other
parties being a new and independent cause as a matter of law, such that
causation was lacking); Coleman v. Equitable Real Estate Invest. Manag.,
Inc., 971 S.W.2d 611, 616B18 (Tex. App.CDallas 1998, no pet.) (concluding that summary judgment was
proper as to element of proximate cause because, even if defendant had duty to
provide reasonable security, employee=s opening of locked door after store
had closed to allow man inside was a new and independent cause as to negligence
claim for damages after the man murdered that employee and one other); Aerospatiale
Helicopter Corp. v. Universal Health Services, Inc., 778 S.W.2d 492, 496B97 (Tex. App.CDallas 1989, writ denied) (holding
that even if company=s part was defective and caused one of the two engines in the
helicopter to fail, there was no causation as a matter of law because pilot of
helicopter broke causal chain when he, in violation of proper procedures, cut
the fuel line to the remaining engine that was operating sufficiently at the
time).  








Furthermore,
at some point in the causal chain, a defendant=s conduct may be too remotely
connected with the plaintiff=s injury to constitute legal causation.  See Union Pump,
898 S.W.2d at 775.  The law does not hold people legally responsible for the
remote results of their wrongful acts and therefore draws a line between
immediate and remote causes.  Id.  To be a legal cause of another=s harm, the negligence also must be a
substantial factor in bringing about the plaintiff=s harm.  Id. at 776.  The word
Asubstantial@ is used to denote the fact that the
defendant=s conduct had such an effect in producing the harm as to lead reasonable
people to regard it as a cause, using that word in the popular sense, which
includes the idea of responsibility, rather than in the so-called Aphilosophic sense,@ which includes every one of the
great number of events without which any happening would not have occurred.  Id. 
In other words, the conduct of the defendant may be too attenuated from the
resulting injuries to the plaintiff to be a substantial factor in bringing
about the harm.  Union Pump, 898 S.W.2d at 776.  Often the causal link
between conduct and injury will be too remote to be legally significant when
two separate and sequential incidents that are allegedly tortious join to lead
to the injury.  See IHS Cedars Treatment Center of Desoto, Tex., Inc. v.
Mason. 143 S.W.3d 794, 800 (Tex. 2003).  Under the applicable standard of
review, the causal link between Kellogg=s work in 1995 and 1996 and the
explosion and fire on March 27, 2000, is too remote, and, as a matter of law,
any act or omission by Kellogg was not a substantial factor in bringing about
the Workers= injuries.  See Ambrosio v. Carter=s Shooting Center, 20 S.W.3d 262, 266B69 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied) (affirming summary judgment and concluding there was no causation as a
matter of law because any negligence by the store in storing and displaying
firearms was too remote from decedent=s murder using a gun stolen from the
store); Roberts v. Healey, 991 S.W.2d 873, 877B80 (Tex. App.CHouston [14th Dist.] 1999, pet.
denied) (affirming summary judgment and holding that any negligence by divorce
attorney in failing to obtain protective order against his client=s estranged husband was too remote
from the husband=s murder of couple=s two children for lawyer=s negligence to be legal cause of
mother=s damages).  Therefore, to the extent
the Workers= allegations of negligence survive Kellogg=s no-duty challenges, the trial court
did not err in granting summary judgment as to the Workers= negligence allegations because
summary judgment was proper as to proximate cause. Accordingly, we overrule the
Workers= remaining issues.  

The
trial court=s judgment is affirmed.

 

 

 

/s/        Kem Thompson Frost

Justice

 

Judgment rendered and Opinion filed
March 27, 2007.

Panel consists of Justices Anderson,
Edelman, and Frost. (Edelman, J., concurs without opinion).









[1]           The facts set forth in this section are all
based on the summary-judgment evidence under the familiar summary-judgment
standard of review.





[2]           The K-Resin process described in this
opinion is the one in use at the time of the occurrence made the basis of this
suit.





[3]           Butadiene also reacts with itself to form Adimmers@
and Atrimer@ in a reaction
in which the rate depends on the temperature and increases rapidly at higher
temperatures.  





[4]           In some places in the evidence, it states
this occurred on March 25, in other places on March 26.





[5]           The motions reviewed on appeal are the AAmended Motions for Summary Judgment of Defendants,
Kellogg Brown & Root, Inc. and Halliburton Company@ filed on July 2, 2003.





[6]           To the extent the Workers argue that the
trial court=s judgment is final but that the trial court erred on
the merits in granting the motions because Kellogg did not explicitly attack
all eighteen alleged acts of negligence, this argument also lacks merit.  The
Workers only asserted claims based on Kellogg=s alleged negligence.  Though they did allege eighteen acts of
negligence, the grounds asserted by Kellogg, if meritorious, are sufficient to
merit a dismissal of all the Workers=
claims, notwithstanding the allegations of eighteen acts of negligence.  To
assert a summary-judgment ground against a claim, it is not always necessary to
specifically attack every allegation in the nonmovant=s petition.  See Lampasas v. Spring Center, Inc.,
988 S.W.2d 428, 435B36 (Tex. App.CHouston
[14th Dist.] 1999, no pet.) (holding that motion for summary-judgment need not
address every single allegation of negligence in plaintiff=s petition and that summary judgment can be affirmed
if motion and evidence show movant is entitled summary judgment as to all
claims).





[7]           This term is not defined in the documents.





[8]           This term is not defined in the documents.





[9]           This language appears to conflict with
language in the first document stating that A[r]elief
header and flare/vent systems are NOT included@ in the scope of work.  However, we need not address this apparent
conflict to dispose of this appeal.  





[10]          The Workers also cite testimony from Project
Manager Clint Wood that A[a]ny design or evaluation of a pressure relief system
requires you to consider the potential for a runaway reaction.@  However, Wood did not testify that Kellogg=s scope of work was either to design or evaluate any
pressure relief system.  In any event, if Kellogg had to consider all relieving
conditions, then one relieving condition considered would be overpressurization
due to a runaway reaction.  The Workers also cite testimony from a Kellogg
engineer that Kellogg was aware that a runaway reaction was a possible hazard
associated with butadiene; however, that testimony goes to Kellogg=s awareness rather than its contractual scope of work.





[11]          In addition, Howell=s statements regarding the content of various
deposition transcripts are conclusory and do not raise a fact issue.  See
Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp., 136 S.W.3d
227, 232 (Tex. 2004) (stating that even unobjected‑to conclusory
testimony does not raise a fact issue).





[12]          Furthermore, the evidence reflects that
Phillips had a problem in the past with having so many alarms that the
operators did not take the alarms seriously.





[13]          The Phillips team identified the following Acausal factors@:
(1) disabling of the Safety Valve, (2) Phillips=s failure to fully take into account the increased likelihood of
popcorn polymerization after 1997, when the alumina dryers were added to the
K-Resin process, (3) Phillips=s allowing
uninhibited butadiene to remain too long in the East Tank at ambient
temperatures and without cooling, purging, or pressure relief, and (4) Phillips=s failure to take prompt action after the loss of the
nitrogen purge on the East Tank on March 16.  The team dismissed all the
following as playing a role in the incident: (1) inadequately sized pressure
safety valve, (2) incorrectly installed rupture disk, (3) incorrectly set
pressure safety valve, (4) wrong pressure safety valve installed, and (5)
relief lines plugged with polymer.  





[14]          The Workers cite Bottoms v. Smith regarding
the proximate-cause issue.  See 923 S.W.2d 247, 250B51 (Tex. App.CHouston
[14th Dist.] 1996, no writ).  The Bottoms case did not involve any issue
of new and independent cause.  See id.  While the Bottoms court
did conclude there was a fact issue as to whether a doctor=s alleged negligence in failing to perform a
diagnostic test proximately caused decedent=s
death from cancer, the nature of the claims and the summary-judgment evidence
in Bottoms differ significantly from those in this case. See id. 
Therefore, the Bottoms case does not require a reversal in this case.